OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1897.

*(Continued from Volume 138.)*

JONES v. WILLIAMS *et al., Appellants.*

In Banc, May 4, 1897.

1. **Corporations:** CONTRACTS: INTENTION OF PARTIES. Where a contract apears on its face to be a personal one but one of the persons who signed it had authority to sign it as agent of a corporation, the question of whether he signed it in his personal or representative capacity, is one of intention. It is not therefore necessary that his authority should have been recited in the contract or his official character suffixed to his name, since this can be shown by evidence *aliunde.*

2. ———: STOCKHOLDERS: POWERS TO MAKE CONTRACTS: RATIFICATION. Corporations must act through boards of directors and by their authorized agents. No stockholder as such, whatever his interest, can without authority from the corporation, bind it by contract, however simple; but his voluntary acts may be adopted and ratified by, and thereby become the acts of, the corporation.

3. ————: BUSINESS, HOW CONDUCTED: DELEGATED AUTHORITY. Section 2508, Revised Statutes 1889, requires that the property and business of a corporation, such as that here involved—a publishing company, whose business was the publication of a daily newspaper—shall be controlled and managed by directors; but it also authorizes these directors "to appoint such subordinate officers and agents as the business of the corporation may require." This statute is not contravened by a contract made by the president of the company whereby one is appointed editor and manager of the newspaper, with exclusive control and management for a period of five years; for, under it the directors of a corporation have authority to delegate to officers, agents or executive committees the power to transact, not only ordinary and routine business, but business requiring the highest degree of judgment and discretion; nor is formal action of the board of directors necessary in order to confer such authority; and the power of such agent is governed by the general law of agency.

4. Authority, Shown by Usage: RATIFICATION BY ACQUIESCENCE. The evidence shows that Pulitzer, the president of the company, and the owner of nearly five sixths of its stock, had from its formation exercised absolute power over it, and that his acts had always been acquiesced in by the other directors and stockholders; in fact, that he was the company's *alter ego*. The contract between him and the plaintiff by which the latter was appointed editor and manager of the newspaper, with exclusive control and management thereof for a period of five years, was against the interest of two of the directors and was not approved by them, but it is nevertheless binding upon them and upon the company, inasmuch as they did not protest against the same, they remaining silent because they recognized the power and delegated authority of Pulitzer.

5. Contract: FOR PURCHASE OF SHARES AND APPOINTMENT TO OFFICE IN COMPANY NOT INVALID AS AGAINST PUBLIC POLICY, WHEN. The contract by plaintiff with Pulitzer for the purchase of shares in the corporation coupled with an agreement for the election of plaintiff as director and president and his appointment as editor and manager of the newspaper, with exclusive control for a period of five years, at an annual salary of $10,000, was not invalid as against public policy, such contract having been approved by the unanimous acquiescence of all the stockholders; and this is so whether they voted with full knowledge of all the terms of the contract, or blindly in obedience to the directions of Pulitzer.

6. ————: PERSONAL SERVICES: PROPERTY INTEREST: PRETIUM AFFECTIONIS: INJUNCTION. Plaintiff by his contract purchased one sixth of the stock of the company for which he paid $80,000, and in consideration of this was to have the control and management of the newspaper for five years at a salary of $10,000 a year. He was also

entitled to the dividends upon the stock purchased. He had also a reputation as a successful manager of a great metropolitan newspaper to sustain and an opportunity to increase it. In addition, the contract and management of the paper would give him a power and influence among men which were *pretium affectionis* and not estimable in money. An action for damages would not give him an adequate remedy for the breach of the contract and therefore a suit for an injunction would lie.

7. ———: DAMAGES: EQUITABLE INTERFERENCE. In giving construction to section 5570, Revised Statutes 1889, this court *holds* that the action of injunction may be resorted to, notwithstanding there may be an adequate remedy at law for the injury, in all cases where an adequate remedy can not be afforded by an action for damages as such. Where it is perfectly clear that the chief inducement for the acceptance by the plaintiff of the contract were the facts that he was given the control and management of a great newspaper in St. Louis at a time of intense political movements and that he has a reputation as a successful manager of great metropolitan papers to maintain, this court will *hold*, under the terms mentioned in the contract of his employment, that he had no adequate remedy at law for his discharge in an action for damages, because by the terms of the contract of employment the company had given plaintiff absolute control of the paper if he brought it up to the test of financial success by the contract prescribed, and the injury resulting in depriving him of this right to control could not be compensated in damages.

8. ———: ———: MUTUALITY. Nor was there any such want of mutuality in the contract as would prevent a court from restraining an attempt by the board of directors to remove and discharge the plaintiff, inasmuch as his exclusive control of the paper was by the contract conditioned upon his making the net profits for two years as large as they had been for the prior two years, and inasmuch as this contract provided that in case of his failure to meet these tests he should forfeit his position and salary; for, while the court could not by decree compel him to perform the duties of editor and manager in case of his failure to do so, it could enjoin his interference with the conduct and management of the paper if he failed to measure up to these tests.

9. ———: ———: CONTRACTS FOR PERSONAL SERVICES. Where by the terms of a contract the plaintiff is answerable to no one for the manner in which he performs his duty, and is accountable only for the stipulated results, namely, that the financial profits of a newspaper for two years shall be as large as they were for two years prior, his position gives him a property right in the possession, control and management of the paper.

Jones v. Williams.

10. ———: PERSONAL SERVICES: PROPERTY INTEREST: SPECIFIC PERFORM-
ANCE. Contracts for personal service will not, because they can not,
be enforced by courts of equity. But the contract of plaintiff was
not merely for personal service. It gave him a property right in the
possession, control, and management of the paper, and where such
is the case he will be protected by a court of equity from dismissal
and ouster. (SHERWOOD and ROBINSON, JJ., dissenting.)

PER SHERWOOD, J., DISSENTING, ROBINSON, J., CONCURRING.

1. **Contract:** SALE OF SHARES BY MAJORITY STOCKHOLDER, THOUGH
COUPLED WITH APPOINTMENT TO OFFICE NOT CORPORATE ACT. The
contract between Pulitzer and plaintiff was for the sale by Pulitzer
of shares in the company belonging to him for a price to be paid to
him. It provided also for the election of plaintiff as director and
president of the company. It provided further for the appointment
of plaintiff as editor and manager of the newspaper published
by the company for five years at an annual salary of $10,000. This
appointment was by the contract expressly stated to be a part of the
consideration moving to Pulitzer for the sale of the shares. The con-
tract in form was between Pulitzer and plaintiff personally, and evi-
dence *aliunde* showed that the parties dealt as individuals. The
contract under these circumstances can not be held to be the act of
the company, even though Pulitzer owned a large majority of the
stock.

2. ———: RATIFICATION: MUST BE AFFIRMATIVE AND WITH FULL KNOWL-
EDGE. The contract could not be ratified by the company except by
some affirmative act done with full knowledge of the terms of the
contract. Some of the shareholders of the company had no knowl-
edge of its terms, until the first stockholders' meeting held after its
execution when a by-law was adopted, by the concurring vote of all
save plaintiff, which was objected to by him as in violation and re-
pudiation of his contract. At the meeting of the board of directors,
held next after the stockholders' meeting, resolutions were passed
with the assent of plaintiff by which it was determined that the policy
of the paper should remain unchanged and that the president as such
should have control of the paper, subject to the paramount authority
of the board of directors. Plaintiff was appointed editor and man-
ager for the term of one year and was elected president for the term
of one year. He had been shown the resolutions referred to before
they were offered for adoption and had written that he could and
would work as president, editor, and manager under them in a peace-
able and mutually satisfactory manner. *Held,* to show not a ratifica-
tion but a repudiation of the claim of plaintiff to absolute control of
the paper and acquiescence by him in the paramount authority of the
directors.

3. **Corporation**: EXISTENCE OF: ESTOPPEL.  The plaintiff having proceeded in this suit against the corporation as a corporation and against three of its directors as such, can not now be heard to assert that the company is a mere "dummy" organization and that therefore the individual contracts of Pulitzer may be enforced against it.

4. **Contract**: MUTUAL ASSENT.  Although plaintiff contends that the contract was designed to give him absolute control of the newspaper, it clearly appears that Pulitzer understood otherwise and the minds of the parties not having met upon this essential element specific performance will not be awarded.

5. ———: CONSTRUCTION.  The contract did not by its terms give plaintiff "absolute" control of the newspaper.  Such control was by section 2772, Revised Statutes 1889, reserved to the board of directors, and any construction of the contract divesting or suspending the authority of the board would render it illegal.

6. ———: BREACH BY PLAINTIFF: SPECIFIC PERFORMANCE.  By a supplementary writing executed contemporaneously with the contract sued upon and as a part of it, plaintiff agreed that the board of directors should have the sole power to incur financial obligations on behalf of the company.  This stipulation having been violated by him, he is not entitled to the remedy of specific performance.

7. ———: SPECIFIC PERFORMANCE: MUTUALITY.  Plaintiff could quit his employment as editor and manager at any time without breach of his agreement.  The contract therefore should not be specifically enforced for want of mutuality in its obligations.

8. ———: UNCONSCIONABLE: NOT SPECIFICALLY ENFORCED.  As construed by plaintiff the contract would make the corporation liable for libelous publications in the newspaper when it was without power to prevent them, and specific performance of the contract should be refused because it was unreasonable and unconscionable in its operation.

9. ———: PERSONAL SERVICE: PROPERTY INTEREST: INJUNCTION.  The contract was one for personal service, none the less so because coupled with and part of an agreement for the purchase of property, and an injunction will not be granted to coerce the employer into continuing the employee in his service.

10. ———: POWER TO ENFORCE.  The want of power in the courts to enforce a contract for personal service can not be supplied by any provision of the contract itself.

11. ———: ULTRA VIRES: PUBLIC POLICY.  The contract as construed by the majority is *ultra vires*, because in conflict with section 2772, Revised Statutes 1889, which requires that the property or business of a corporation "shall be controlled and managed" by a board of

directors who shall be chosen in a certain prescribed manner. It is also void because opposed to public policy, in that with a sale of stock it welds an agreement for the sale of an office of trust, a position with a salary and the control of the corporate business.

*Appeal from St. Louis City Circuit Court.*—HON. LEROY B. VALLIANT, Judge.

AFFIRMED.

*G. A. Finkelnburg* and *Boyle, Priest & Lehmann* for appellants.

(1) The contract was a personal one between Jones and Pulitzer. Cook on Stockholders, par. 709; Morawetz on Priv. Corp., par. 232; *American Preservers' Co. v. Norris*, 43 Fed. Rep. 711; *Pullman's Palace Car Co. v. Railroad*, 115 U. S. 567; *Moore & Handley Hardware Co. v. Towers Hardware Co.*, 87 Ala. 206; *Davis Wheel Co. v. Davis Wagon Co.*, 20 Fed. Rep. 700; *Button v. Hoffman*, 61 Wis. 20; *England v. Dearborn*, 141 Mass. 590; *Hopkins v. Lead Co.*, 72 Ill. 373; *Humphreys v. McKissock*, 140 U. S. 304; *Smith v. Hurd*, 12 Metc. 385; *Allemony v. Simmons*, 124 Ind. 19; *Besch v. Carriage Co.*, 36 Mo. App. 333; *Pfeiffer v. Lansberg Co.*, 44 Mo. App. 67; *Guernsey v. Cook*, 117 Mass. 548; *Hill v. R. H. C. Mining Co.*, 119 Mo. 9. (2) It was never adopted or ratified by the company in whole or in part. *Steunkle v. Railroad*, 42 Mo. App. 73; Story on Agency, sec. 239. (3) It did not vest Jones with the arbitrary and comprehensive powers claimed by him and sanctioned by the decree. R. S. 1889, sec. 2772; *Wiggins Ferry Co. v. Railroad*, 128 Mo. 245; *Lamar Water Co. v. Lamar*, 128 Mo. 188; *Hobbs v. McLean*, 117 U. S. 567; *Guernsey v. Cook*, 120 Mass. 501; Lawson on Contracts, sec. 389. (4) As the contract of Pulitzer it can not be specifically enforced in a proceeding to which he is not a party.

*Hill v. R. H. C. Mining Co.*, 119 Mo. 9; *Pullman Palace Car Co. v. Railroad*, 115 U. S. 596; Morawetz on Priv. Corp., par. 511; *Hannerty v. Theater Co.*, 109 Mo. 310. (5) It can not be enforced against the corporation as a going concern, even though Pulitzer holds a majority of the stock in the company. *Beal v. Chase*, 31 Mich. 490; *Des Moines Gas Co. v. West*, 50 Iowa, 16; Morawetz on Priv. Corp., par. 536; Cook on Stockholders, par. 715; Beach on Priv. Corp., par. 230; *Flagstaff Mining Co. v. Patrick*, 2 Utah, 304; *Silver Hook Road Co. v. Green*, 12 R. I. 164; *Gillis v. Bailey*, 21 N. H. 149; *Ins. Co. v. Chase*, 56 N. H. 341; *Railroad v. Richey*, 40 Me. 425; *Gratz v. Redd*, 4 B. Monroe, 186; *Howard's* case, L. R. 1 Ch. 561; *Temple v. Dodge*, 32 S. W. Rep. 514. (6) Constructed as plaintiff contends, the contract is *ultra vires* and against public policy. *Flagstaff Mining Co. v. Patrick*, 2 Utah, 304; *Coburn v. Land & Cattle Co.*, 25 Fed. Rep. 791; *West v. Camden*, 135 U. S. 507; *Guernsey v. Cook*, 128 Mass. 501; *Noel v. Drake*, 62 Kan. 265; *Wilbur v. Stoepel*, 28 Mich. 344; *Noyes v. Marsh*, 123 Mass. 286; *Cone's Ex'r v. Russell*, 48 N. J. Eq. 208; *Fremont v. Stone*, 42 Barb. 169; *Fennessy v. Ross*, 39 N. Y. S. 323; *Neall v. Hill*, 16 Cal. 145; Grant on Corp. 243. (7) The plaintiff has an adequate remedy at law by an action for damages. *Marshall v. Craig*, 4 Am. Dec. 647; *Pond v. Wyman*, 15 Mo. 175; *Davis v. Crawford*, 12 Am. Dec. 382; *Jones v. Walker*, 56 *Id.* 557. (8) The just enforcement of the contract between the parties involves the constant supervision of the court. *Cooper v. Pena*, 21 Cal. 403; *Danforth v. Philadelphia*, 30 N. J. Eq. 12; *Blanchard v. Detroit*, 31 Mich. 43; *McCarthy v. Armstrong*, 32 S. C. 203; *W. & M. Co. v. Freeman*, 41 Fed. Rep. 412; *Railroad v. Speer*, 32 Ga. 550; *Railroad v. Marshall*, 136 U. S. 393. (9) The contract can not be specifically enforced for

want of mutuality. *Marble Co. v. Ripley*, 10 Wall. 359;
Fry on Specific Performance, secs. 460, 461; *Iron Age
Co. v. Tel. Co.*, 83 Ala. 498; Pomeroy on Contracts,
secs. 163-165; *Ickert v. Beavers*, 106 Ind. 487; *Buck v.
Smith*, 29 Mich. 166; *Baldwin v. Society, etc.*, 9 Sim.
393; *Wakeman v. Barker*, 22 Pac. Rep. 239; *Smith v.
McVeigh*, 11 N. J. Eq. 239; *Mastin v. Halley*, 61 Mo.
196–200; *Glass v. Rowe*, 103 Mo. 513–539. (10) The
court will not enforce the contract because that
involves the compulsory acceptance of personal services
and compulsory maintenance of personal and confi-
dential relations. Waterman on Specific Performance,
sec. 33; Fry on Specific Performance, secs. 460, 461;
*De Rinafinola v. Corsette*, 4 Paige Ch. 264; *Rogers
Mfg. Co. v. Rogers*, 20 Atl. Rep. 467; *Davis v. Forman*
(1894) 3 Ch. L. R. 654; *Pickering v. Bishop of Ely*, 2
Y. & C. C. C. 249; *Horne v. Railroad*, 10 Weekly Rep.
170; *Brett v. Shipping Co.*, 12 Weekly Rep. 596; *Gillis
v. McGhee*, 13 Ir. Ch. 48; *Johnson v. Railroad*, 3 De
Gex. M. & G. 914; *Mair v. Tea Co.*, L. R. 1 Eq.
Cases, 411; *Stocker v. Brockelbank*, 20 Law Journal
(N. S.), Ch. Cas. 408; *Bainbridge v. Smith*, 41 Ch.
Div. 462; *Buck v. Smith*, 29 Mich. 166; *Richmond v.
Railroad*, 33 Iowa, 423; *King v. Gildersleeve*, 21 Pac.
Rep. 961; *Converse v. Hood*, 21 N. E. Rep. 876; *Dulin
v. Wood & Coal Co.*, 35 Pac. Rep. 1045; *Coburn v.
Cedar Valley Land & Cattle Co.*, 25 Fed. Rep. 791.

*James M. Lewis* and *Judson & Taussig* for re-
spondent.

(1) Dealing with the defendant company as a cor-
porate entity, the appointment of plaintiff as editor
and manager of the *Post-Dispatch* under the terms and
conditions set forth in the contract, was the contract of
the defendant corporation, in law as well as in equity.

The notice of appointment was signed by Pulitzer as president. The appointment under the conditions of said contract may be shown to be the contract of the company by authorization, express or implied, ratification, express or implied, in whole or in part, or acceptance by the corporation of the benefits of the contract. *Milledge v. Boston Iron Co.*, 5 Cushing, 175 and 179; *Am. Preservers' Co. v. Taylor Mfg. Co.*, 46 Fed. Rep. 152; *Sparks v. Dispatch Transportation Co.*, 104 Mo. 547. The contract must be construed in the light of all the surrounding circumstances, and clearly appears to have been intended as a corporate act, for the benefit of all interested in the property. Bishop on Contracts, sec. 392; *County of Johnson v. Wood*, 84 Mo. 489. (2) Mr. Pulitzer, as president of the corporation, was vested with the executive powers of the company, and under the testimony admittedly exercised, and was permitted by all interested in the corporation to exercise, absolute control. His authority to represent the corporation will, therefore, be implied from the manner in which he was permitted to conduct its business. *Bank v. North Mo. Co.*, 86 Mo. 125; *Ins. Co. v. Seminary*, 52 Mo. 480; *Kiley v. Forsee*, 57 Mo. 390; *Sparks v. Dispatch Transportation Co.*, 104 Mo. 531; *Bank v. Bank*, 107 Mo. 133; *Moore v. Gaus & Sons' Mfg. Co.*, 113 Mo. 98; *Winston v. Bank*, 18 Mo. App. 665; *Oakes v. Cataraugus Water Co.*, 143 N. Y. 432; *Sherman v. Fitch*, 98 Mass. 59; *Martin v. Webb*, 110 U. S. 7; Taylor on Corporations [3 Ed.], sec. 236; *Railroad v. Sidell*, 66 Fed. Rep. 27; *Railroad v. Sidell*, 67 Fed. Rep. 27; *State v. Silva*, 32 S. W. Rep. 1007, 1013. (3) Whether authorized or not, the contract was ratified by the defendant corporation, considered in its strictest sense as a legal entity distinct from the individuals composing it. *Bank v. Bank*, 107 Mo. 133; *Bank v. Fricke*, 75 Mo. 178; 4 Thompson on Corp., sec.

5285, *et seq.; Pittsburg Co. v. Keokuk Bridge Co.*, 131 U. S. 371; *Fitzgerald Co. v. Fitzgerald*, 137 U. S. 98. (4) Ratification of part of an unauthorized act is the ratification of the whole. The admitted acceptance of plaintiff as editor and manager was of itself a ratification of the entire contract. Mechem on Law of Agency, 130; *Bank v. Badger Lumber Co.*, 54 Mo. App. 327; *State ex rel. Laupheimer v. Harrington*, 100 Mo. 170. (5) At the time of this admitted partial ratification, March 21, the directors participating therein had full knowledge of the essential features of the contract. The testimony of Carvalho and White shows clearly that the resolution of ratification theretofore prepared was knowingly altered for the purpose of making a partial ratification. (6) The corporation, still considered in its strictest sense as a legal entity, as well as all the directors and all the stockholders, accepted the benefits of the contract, to wit, the talents and services of the plaintiff; and said corporation and all interested therein are now estopped from disputing the validity of said contract. 2 Thompson on Corp., secs. 5247, 5250, *et seq.* (7) Still considering the corporation in its strictest sense as a legal entity, there is no legal objection to the contract in question. *First.* It is not *ultra vires*, nor does it involve a delegation or abrogation of the powers of the board of directors. The contract gives plaintiff control of the newspaper, not of the corporation. Green's *Ultra Vires*, 491; 1 Morawetz on Corporation, sec. 534; Taylor on Corporation, sec. 235; *Anderson v. Langden*, 1 Wheaton, 85; *Bank v. Chickering*, 3 Pickering, 335; *Bank v. Ridgley*, 1 H. & G. (Md.) 324–332; *Bank v. Rogers*, 7 N. H. 33; *Railroad v. Furnace Co.*, 27 Ohio St. 321; *San Diego v. Flume Co.*, 29 L. R. A. 39; 28 Cal. 549. *Second.* Nor did it in any sense lack mutuality of obligation and remedy. Pomeroy on Specific Performance, sec. 166; *Allen v.*

*Cerro Gordo Co.*, 40 Iowa, 349; 2 Beach, Eq. Juris., sec. 637; *Mastin v. Grimes*, 88 Mo. 484. *Third.* Neither has the admitted principle which invalidates contract whereby a director for a personal consideration undertakes to sell his influence in an election to a corporation office, any application to the facts of the case at bar. The primary purpose of the contract was admittedly not the sale of the stock. That was included solely to enlist the plaintiff more thoroughly in the success of the enterprise, and for the benefit of all interested in the property. (8) His contract was for the control of certain property of the corporation as distinguished from the corporation itself. Neither is he estopped or precluded from the assertion of his contract rights by any waiver thereof in connection with the corporate meetings. The evidence shows that he persistently, both at the stockholders' and directors' meetings, prior and subsequent thereto, reasserted his contract claims. (9) Under the facts of this case the Pulitzer Publishing Company will not be considered as a legal entity separate and distinct from Joseph Pulitzer himself. This is the basis upon which the relief was sought in the petition, and upon which the court below, on the final hearing, granted its decree. Equity deals with substance and disregards form, and a man will not be permitted, under cover of a corporate organization, controlled and practically owned by himself, to defeat the execution of a contract which he has made, and of which, through the corporation, he and his associates have received the benefit. 2 Cook on Stockholders [3 Ed.], sec. 663a; 1 Morawetz, sec. 227; Taylor on Private Corporations, sec. 49 to 51, and note; *State ex rel. Watson v. Stand. Oil Co.*, 49 Ohio St. 137, and 15 L. R. A. 145; *Sugar Trust* case, 121 N. Y. 502, and 9 L. R. A., p. 33; *Stockton v. Rail-oad*, 17 L. R. A. (N. J.) 97 (see langage in this case as to

throwing off corporate disguise); *Sportman Shot Co. v. Am. S. & L. Co.*, 30 O. L. B. 87; *Hannerty v. Standard Theater Co.*, 109 Mo. 297; *Beale v. Chase*, 31 Mich. 490; *Am. Preservers' Co. v. Mfg. Co.*, 46 Fed. Rep. 152; *Wheel Co. v. Wagon Co.*, 20 Fed. Rep. 700; *Wood v. Lessee of Ferguson*, 7 Ohio St. 291; *Des Moines Gas Co. v. West*, 50 Iowa, 16-25. (10) Plaintiff had no adequate remedy at law by action for damage. Even if he could recover the salary, despite the contingency of his right to the extension beyond a year, he clearly has no adequate remedy by action for damages for the investment of his money in the acquisition of this stock, nor the loss of the control, the *pretium affectionis*, secured to him by his contract. *Bank v. Kircheval*, 65 Mo. 682; 3 Pomeroy, Eq. [3 Ed.], secs. 1338, 1943, and 1344; *Albers v. Merchants' Exchange*, 39 Mo. App. 583; Anderson's Law Dictionary, 709; 2 Story's Eq. 706, 709; *Somerby v. Buntin*, 118 Mass. 279; *Railroad v. Railroad*, 144 N. Y. 152; *Maher et al. v. Garry et al.*, 34 N. Y. S. 363; *North v. Peters*, 138 U. S. 271; *Watson v. Sutherland*, 5 Wallace, 74; *Manhattan Mfg. Co. v. N. J. Stock Yard Co.*, 23 N. J. Eq. 161; *Frederick v. Frederick*, 1 P. Wms. 710; *S. School District v. Gas Co.*, 154 Pa. St. 539; *Sullivan et al. v. Tuck, Ex'r*, 1 John Ch. (Md.) 59; *Furman v. Clark*, 3 Stockton (N. J.), 306. (11) The contract itself contained mutuality of obligation and remedy and was binding upon the plaintiff, and is enforcible by defendant company against plaintiff in law or equity whenever either jurisdiction is properly invoked. High on Injunctions [3 Ed.], 1163, 1164, and cases cited; Bispham on Equity, sec. 464, and cases cited; *Montague v. Flockton*, Law Rep. 16 Equity, 189; *Railroad v. Railroad*, 24 Fed. Rep. 516; *W. U. Tel. Co. v. Railroad*, 3 Fed. Rep. 423; *Wells, F. & Co. v. O. N. Co.*, 16 Am. and Eng. R'y Cases, 71; *Same v. Railroad*, 18

Am. and Eng. R'y Cases, 441. (12) Neither does the enforcement of the contract involve a constant supervision of the court. The test of performance is fixed by the contract. It is no answer to the prayer for injunction against the invasion of a legal right that the defendants may cause trouble by violating the injunction. *Railroad v. Railroad*, 24 Fed. Rep. 516; *W., F. & Co. v. Railroad*, 18 Am. and Eng. R'y Cases, 440; *Wolverhampton & W. Co. v. Railroad*, Law Reports, 16 Equity, p. 442; *W. U. Tel. Co. v. St. Joe Co.*, 3 Fed. Rep. 430. (13) Neither is there anything in the objection that the enforcement of this contract involves the compulsory acceptance of personal services and compulsory maintenance of personal and confidential relations. This is not a contract of service, but the essential basis of the contract is the acquisition of a special property right in the paper, the right to control its management, which is a property right in itself. Anderson's Law Dictionary, title "Property," p. 836; 2 Blackstone, 388, *et seq.*; Austin's Lectures on Juris., sec. 837; *Hamilton-Brown Shoe Co. v. Saxey*, 131 Mo. 212; *Marble Co. v. Ripley*, 10 Wallace, 339; Beach on Injunctions, sec. 952; *News v. Right*, 44 Miss. 202.

MACFARLANE, J.—In December, 1891, the "Pulitzer Publishing Company," one of the defendants herein, was incorporated under the laws of the State of Missouri, which provide for the organization of business corporations. The capital stock of the company is $1,000,000, divided into ten thousand shares of $100 each.

The principal property of this corporation consisted of a daily newspaper published in the city of St. Louis, known as the *Post-Dispatch*. This paper was established years before by Joseph Pulitzer, who at the time of the incorporation was practically the sole owner.

The said Pulitzer was an experienced and successful newspaper man, and under his management the *Post-Dispatch* and its good will had become very valuable property. This property was transferred to the corporation in payment for the capital stock. Of the stock Pulitzer gave to his wife eight hundred shares and to his brother-in-law, William L. Davis, four hundred shares.

By the articles of association it appears that eight shares were subscribed by Charles Gibson, one share by Daniel W. Wood and one share by Samuel Williams.

At the time of the organization of the corporation, Joseph Pulitzer was, and for a number of years prior thereto had been, residing in the city of New York, where he was engaged in the publication of a newspaper known as *The World*, of which he was also practically the owner.

Prior to February, 1895, the plaintiff, Charles H. Jones, had made a reputation, in the south and west, as a capable and successful manager and editor of daily city newspapers. He had for a number of years edited a daily paper in St. Louis, and was well acquainted with the people of said city, and of the west generally, and was supposed to know their wants and demands in respect to the character and quality of such papers. At the date of the contract, which is the subject of this litigation, and for some time prior thereto, plaintiff had been employed by Pulitzer as editor of the *World*.

After considerable negotiation between them, on the sixth day February, 1895, the following contract was entered into and signed by Pulitzer and plaintiff:

"This agreement made this sixth day of February, in the year one thousand eight hundred and ninety-five, between Joseph Pulitzer, of the City, County and State of New York, party of the first part, and Charles

H. Jones, of the City of St. Louis, State of Missouri, party of the second part,

"*Witnesseth:* That for and in consideration of the sum of eighty thousand dollars in cash, and the performance by the party of the second part of the conditions hereinafter set forth, the party of the first part agrees to sell and deliver to the party of the second part, one thousand, six hundred and sixty-seven shares of the capital stock of the Pulitzer Publishing Company of St. Louis, Missouri, being one sixth of the total capital stock of said corporation.

"And, whereas, the party of the first part is induced to make this sale and enter into the covenants herein contained on the assurances of the party of the second part of his ability to fulfill the covenants and conditions and avoid the penalties hereinafter set forth.

"Now, therefore, it is agreed by and between the parties hereto, and made a part of the consideration for the sale of said one thousand, six hundred and sixty-seven shares of stock, that the party of the second part shall be appointed the editor and manager of the *Post-Dispatch*, a newspaper published in St. Louis, Mo., by the said Pulitzer Publishing Company, for the term of five years from the date hereof, at an annual salary of ten thousand dollars.

"And the party of the first part agrees to elect the party of the second part director and president of the Pulitzer Publishing Company aforesaid, and to give him control and management of said newspaper, the *Post-Dispatch*, during the above mentioned period of five years:

"*Provided*, however, that such appointment and salary shall cease and determine if the party of the second part (shall fail to properly perform the duties of editor and manager aforesaid or) shall at any time during said term accept or occupy any public or politi-

cal office, elective or otherwise, or engage in any other business of any kind or description, it being covenanted by and between the parties hereto that the party of the second part shall devote all the time, ability and energy he possesses to the growth, prosperity and success of said St. Louis *Post-Dispatch* (and conduct the same with strictest integrity and economy).

"And it is further agreed, by and between the parties hereto, as a test of the ability of the party of the second part to properly manage and edit the said St. Louis *Post-Dispatch*, that such appointment and salary shall cease and determine in the event that the gross revenues of the *Post-Dispatch*, from advertising and circulation combined, shall during the year 1895, be less than the gross revenues from the same sources combined were for the year 1894.

"And it is further agreed, by and between the parties hereto, that said appointment and salary shall cease and determine in the event that the net profits of the *Post-Dispatch* for the year 1896 shall be less than the net profits for the year 1893.

"And it is further agreed, by and between the parties hereto, their executors, administrators and assigns that in case of the death of the party of the second part, his resignation, failure of health or retirement or inability to perform the duties and labors of editor and manager of the *Post-Dispatch* at any time within three years from the date of the execution of this contract, the party of the first part shall have the option to repurchase for the sum of eighty thousand dollars, the herein mentioned one thousand, six hundred and sixty-seven shares of the stock of the Pulitzer Publishing Company, which in such event the party of the second part agrees to sell and transfer to the party of the first part for the sum of eighty thousand dollars.

"And it is further agreed that in case of the death

of the party of the second part, or his resignation, failure of health, retirement or inability to perform the duties and labors of editor and manager of the St. Louis *Post-Dispatch* after the expiration of the aforesaid three years and within two years thereafter, the party of the first part shall have the like option to re-purchase the aforesaid one thousand, six hundred and sixty-seven shares of the stock of the Pulitzer Publishing Company, but in such case the price instead of being eighty thousand dollars shall be such sum as may be fixed as the value of said stock by arbitration. Each of the parties hereto, or their executors or administrators, shall name an arbitrator, and if the arbitrators shall differ in their appraisement, they shall name an umpire, and the decision of said umpire shall be final as to the value of said stock.

"The word 'presidency' in line 9, page 2, stricken out; the words 'shall fail to properly perform the duties of editor and manager aforesaid or,' between lines 10 and 11, page 2, inserted; the words 'and conduct the same with strictest integrity and economy,' end of line 17 and sub page 2, inserted; word 'death,' line 6, page 3, and word 'death,' line 18, page 3, substituted for words 'default' in both places before execution hereof.

"In witness whereof the parties hereto have set their hands and seals the day and year first above written.

"JOSEPH PULITZER,

"CHARLES H. JONES."

This contract was supplemented by a letter of the same date, from plaintiff to Pulitzer, as follows:

"JEKYL ISLAND, GA., Feb. 6, 1895.

*"Joseph Pulitzer, Esq.,*

"MY DEAR SIR:—I have to say to you by this letter that I take the office of the Pulitzer Publishing

Company under the express agreement that I will agree to the adoption of a set of by-laws to be hereafter framed absolutely forbidding any officer of the company from signing notes or similar obligations of the company; that even contracts involving financial obligations must have the board's approval.

"I further agree to take certificates of stock which shall contain written on their face the words, 'This stock is held subject to the terms and conditions of agreements made of even date;' with the understanding that at the expiration of five years new certificates not so indorsed shall be issued to me.

"Yours very truly,

"C. H. JONES."

On the same day Pulitzer addressed this letter to Mr. Samuel Williams, who was then the editor of the *Post-Dispatch:*

"JEKYL ISLAND, GA., Feb. 6, 1895.

"DEAR MR. WILLIAMS:—I hereby appoint Colonel Charles H. Jones editor and manager of the St. Louis *Post-Dispatch.*   Please notify the others.

"Faithfully yours,

"JOSEPH PULITZER, Pres't."

Plaintiff reached St. Louis on the fourteenth of February, where he was, on that day, accompanied by Mr. Williams, introduced to the employees of the *Post-Dispatch* and duly installed as editor.   Afterward, on March 16, a stockholders' meeting was held, and Charles H. Jones (plaintiff), Samuel Williams, Florence D. White, Joseph Pulitzer, and S. S. Carvalho were unanimously elected directors.   At this meeting the entire stock of the corporation was voted.

At the date of this contract the stockholdings of the corporation were as follows:

Jones v. Williams.

| | |
|---|---|
| Joseph Pulitzer........................ | 8,796 shares |
| Kate Davis Pulitzer . ...................... | 800 shares |
| Wm. Leonard Davis............................ | 400 shares |
| Charles Gibson.............................. | 1 share |
| D. W. Woods ................................. | 1 share |
| F. D. White................................. | 1 share |
| Samuel Williams ............................. | 1 share |

At this time Joseph Pulitzer, Wm. L. Davis, Charles Gibson, Samuel Williams, and Florence D. White were directors. The officers were Joseph Pulitzer, president; Samuel Williams, vice-president; Charles Gibson, secretary.

The stock held by Williams, Gibson, and White was merely nominal, though White had a contract with Pulitzer for two hundred shares upon which about $9,000 had been paid.

Between the date of the contract and the election of directors, Pulitzer had given Carvalho one share of the stock in order to qualify him to act as director.

Plaintiff continued to act as president of the company, and as manager and editor of the *Post-Dispatch* until August 31, 1895, when, after consultation between directors Pulitzer, Williams, and Carvalho, plaintiff was notified that the policy of the *Post-Dispatch* should be radically changed on the "silver question" and as to its course regarding the "Stone Democratic faction." No reply having been received to this notice, and no change in the policy of the paper having been made, on the seventh day of September, 1895, a second notice was addressed to plaintiff which, after reciting the demands previously made, proceeds: "It would be pleasanter and more agreeable if you pledge prompt and loyal compliance to make these changes at once. If, however, you do not pledge prompt and loyal compliance, a meeting of the board of directors will be called, when the matter will be laid before it, that it may immediately proceed to take action to protect the *Post-*

*Dispatch* from the danger and folly of its present management."

Three days after the date of this letter plaintiff received the following notice:

"COL. CHAS. H. JONES:—In accordance with request from majority of the board of directors—Messrs. Williams, Pulitzer, and Carvalho—you are hereby notified that a special meeting of the Pulitzer Publishing Company is called for Saturday, September 21st, in the *Post-Dispatch* building, St. Louis, Mo., at 12 o'clock noon. .

"Yours,

"S. S. CARVALHO."

Upon receipt of this notice plaintiff commenced this suit against the corporation and the directors. Pulitzer was never served, nor does he appear. The petition alleged full and faithful compliance with the terms of the contract on the part of plaintiff, and charged that defendant corporation and its board of directors were threatening to interfere with his control and management of the *Post-Dispatch*, contrary to the terms of said contract, and concludes with the following averments and prayer:

"Plaintiff states that he has no adequate remedy by action for damages; that it is impossible to calculate or estimate the profits which will inure to him, during the coming five years, from his one-sixth interest in the paper, in view of the rapid and extraordinary increase in the business of the paper during the few months of plaintiff's control. It is also impossible to calculate or estimate the increase in the value of said one sixth interest of plaintiff at the time of the expiration of said contract, which interest plaintiff was induced to purchase solely by reason of the control of the paper during said term, which was secured to him under the aforesaid agreement, and that it is now evident

that such interest will be largely increased in value before the expiration of said term, if plaintiff is not interfered with in the management and control of the paper.

"Wherefore plaintiff says that the acts and doings herein complained of are against equity and good conscience, that defendant Pulitzer, under the cloak of the corporate organization controlled by him and through his dependents therein, will not be permitted to repudiate the aforesaid agreements made and performed in good faith by plaintiff, and that plaintiff is entitled to have said agreement, with his rights of control and management of the *Post-Dispatch* specially enforced by the restraining orders of this court.

"Plaintiff therefore prays that said agreement of February 6, 1895, hereinbefore set out, and his appointment as editor and manager of the *Post-Dispatch* be held valid and binding upon the defendant, the Pulitzer Publishing Company, and the individual defendants herein, directors thereof, and that said defendants Pulitzer, Williams, White and Carvalho, and each of them, and said Pulitzer Publishing Company, and the servants, agents and employes of them, and each of them, be restrained and enjoined by orders of this court from interfering with plaintiff's control and management of the *Post-Dispatch*, or with his control over the columns or policy of the paper during the term of said contract, and that a temporary injunction be granted pending the hearing of this cause,—and for further relief."

A temporary injunction was granted by Judge WOOD and upon final hearing before Judge VALLIANT, the injunction was made perpetual. The important portion of the decree is as follows:

"That the defendants, Samuel Williams, Florence D. White, S. S. Carvalho and the Pulitzer Publishing Company, and the servants, agents and employes of

them, and each of them, be and are hereby restrained and enjoined from interfering with the plaintiff's control and management of the St. Louis *Post-Dispatch* and from, in any manner, hindering or impeding him in his duties as editor and manager of said newspaper during the period ending five years from the 6th day of February, 1895, under terms of the contract of February 6, 1895, set forth in the petition herein, or with plaintiff's control over the editorial policy of said newspaper, or with the performance of his duties as editor and manager under said contract, including the employment, direction or dismissal by him as editor and manager of said newspaper, of any of the subordinates or employes connected with the editorial, news or business departments of said newspaper, provided, however, that if the net profits of said *Post-Dispatch* newspaper, under the plaintiff's management, without hindrance or interference by defendants, or either of them or of Joseph Pulitzer, for the year 1896 be less than the net profits of the said newspaper were for the year 1893, or, if at any time during the period ending five years from February 6, 1895, the plaintiff fails to properly perform his duties as editor and manager aforesaid, or accept or occupy any political or public office, elective or otherwise, or engage in any other business, this injunction shall thereby be dissolved; and for the purpose of more certainly carrying into effect this decree, and to preserve the property and rights of the parties to be affected by it, the court reserves the power to appoint a receiver at any time hereafter, to take possession of the property and earnings of said Pulitzer Publishing Company, and administer the same as the court may direct, and until this decree be fully executed; and defendant Joseph Pulitzer not having been served with process herein, and no appearance having been entered on his behalf, the cause is as to him dismissed; and it

is further ordered that the plaintiff recover of the defendants Samuel Williams, Florence D..White, S. S. Carvalho and the Pulitzer Publishing Company, his costs and charges in this behalf expended, and that execution issue therefor.''

From this· decree the defendants appealed. Any additional facts, deemed necessary to a full understanding of the case, will be stated in the opinion.

I. The first objection, urged by defendant, to the finding and judgment of the trial court is, that the contract was a personal one between plaintiff and Pulitzer, and is not binding on the corporation.

Assuming that Pulitzer had the power to bind the corporation, it sufficiently appears from the contract itself, from what was done under it, and from all the circumstances connected with the transaction, that he intended to bind the company, and that plaintiff supposed he was dealing with Pulitzer as one who had authority to act for the corporation. The parties who signed the contract unquestionably intended that the corporation should be bound. It can always be shown, in case of natural persons, that one who signed a contract, such as this, in his own name, did so as agent for another. Where authority exists the question is one of intention. The same doctrine is applicable to corporations. *Melledge v. Boston Iron Company*, 5 Cush. 173; *A. P. Trust Co. v. Taylor Mfg. Co.*, 46 Fed. Rep. 152; *Sparks v. Dispatch Co.*, 104 Mo. 547.

It was not necessary, therefore, that the authority of Pulitzer should have been recited in the contract, or that the corporate name should have been signed to it, or that the official designation of Pulitzer should have been added to his signature.

II. The question then is, did Pulitzer have authority from the corporation to make the agreement, or was it afterward adopted and ratified by the cor-

poration? In this inquiry we must assume that the contract is one the corporation had the power to make. It may be said here that authority will not be implied from the mere fact that Pulitzer owned a large majority of the stock, and had thereby power to select and control the board of directors. No stockholder, whatever his interests, can, without authority from the corporation, bind it by contract, however simple. Corporations must act through boards of directors or by their authorized officers and agents. Stockholders, as such, have no implied power to represent the corporation, though, of course, they may be appointed agents, and their voluntary acts may be adopted and ratified and thereby become the acts of the corporation. Cook on Stockholders, sec. 709; *Hill v. Coal Mining Co.*, 119 Mo. 9; *Pullman Co. v. Railroad*, 115 U. S. 587.

This is the general rule, though corporations have been made to answer for the unlawful and fraudulent use made by the stockholders of their stock. Corporate existence may also be ignored in order to circumvent the fraudulent purposes of the shareholders in its organization. But with the few exceptions made by courts of equity, for the purpose of working out the rights and equities of the real parties in interest, corporations can only act through their directors. We are aware of no case in which the performance of a contract, made by a stockholder, without authority or adoption, has been enforced against the corporation.

III.    If the contract then was binding on the corporation when first made it was because Pulitzer was authorized to make it. If he had no authority from the corporation then it was his personal contract, and plaintiff must look to him alone for redress.

Counsel argue, with much force, that the directors had no power to delegate to an executive officer, the authority to place its property and business under the

absolute control of a third party, and thereby to divest themselves of the duties which the law has imposed upon them.

It is true the statutes of Missouri require that the property and business of a corporation, such as this one, shall be controlled and managed by directors, but it also authorizes them "to appoint such subordinate officers and agents as the business of the corporation may require." R. S. 1889, sec. 2508.

A corporation may be described as being an artificial being, existing only in contemplation of law; a legal entity, a fictitious person, vested by law with the capacity of taking and granting property and transacting business as an individual. It is composed of a number of individuals authorized to act as if they were one person. The individual stockholders are the constituent or component parts, through whose intelligence, judgment and discretion the corporation acts. The affairs of a corporation can not, in many cases, be conveniently conducted and managed by the stockholders, for they are often numerous and widely separated. Yet they, in reality, compose the body corporate. "It is their acts, when done in the manner prescribed in the constitution of the corporation, that are, properly speaking, acts of the corporation." Taylor on Corp., sec. 50; Morawetz on Corp., sec. 1.

At common law the power to have a board of directors was inherent in the corporation. The statute of Missouri requiring the business and property of a corporation to be managed and controlled by directors, is but an affirmance of the common law power. So likewise the directors have the power, without statutory authority, to delegate to officers, agents or executive committees the power to transact, not only ordinary and routine business, but business requiring the highest. degree of judgment and discretion. Thus authority to

manage the business of railroad corporations, insurance companies, banking institutions and other corporations having large and complicated business interests, is, usually, delegated by the directors to agents, often, but not necessarily, officers of the corporation. These agents, or managing officers, have incidental power to employ all assistants and to do all acts necessary to properly conduct the business over which they are given charge. Formal action of the board of directors is not necessary in order to confer the authority.

The power expressly given by statute to the board of directors "to appoint such subordinate officers and agents as the business of the corporation may require," does not limit or diminish the common law power to delegate authority. The directors represent the impersonal corporation completely, in the business it is authorized to transact, and have the power to do, or cause to be done, whatever they as individuals could do if the business were their own. They act as the corporation itself, as well as under a delegated authority from it. Beach on Priv. Corp., sec. 227. The power of directors to delegate authority to officers and agents has been recognized by this court in many cases. *Bank v. Gilstrap*, 45 Mo. 419; *Sparks v. Dispatch Co.*, 104 Mo. 531; *Moor v. Gaus & Sons Mfg. Co.*, 113 Mo. 106; *First Natl. Bank v. N. Mo. Co.*, 86 Mo. 125.

"If directors, or other corporate agents, do an act which is not beyond the scope of the corporate powers, the question whether the act is binding on the corporation and all persons interested in the corporate enterprise may be usually solved by the ordinary rules of agency." Taylor on Corp., sec. 193; *Hatch v. Coddington*, 95 U. S. 48; *Railroad v. Dixon*, 114 N. Y. 85.

It is said by GANTT, J., in *Gaus & Sons Mfg. Co.*, *supra:* "The power of an agent or officer of a corporation to bind his principal is governed by the law of

agency, and where an officer has been permitted to manage all the business of a corporation, his authority to bind it will be implied from the apparent power thus conferred upon him.''

The president of a corporation is its executive officer. Within the scope of his duties, as the head of the corporation, he has the power to act without direct authority of the directors. Indeed it has been held that ''the president being the legal head of the body, when an act is performed by him, the presumption will be indulged that the act is legally done, and is binding upon the body.'' *Smith v. Smith*, 62 Ill. 493.

However that may be, ''there can be no doubt,'' says Morawetz, ''that the board of directors may invest the president with authority to act as chief executive officer of the company. This may be done either by an express resolution, or by acquiescence in a course of dealing. A person dealing with the president of a corporation in the usual manner, and within the powers which the president has been accustomed to exercise without the dissent of the directors, would be entitled to assume that the president had actually been invested with those powers.'' Morawetz on Corp., sec. 538.

This corporation was organized for pecuniary profit and gain. For the purposes contemplated the entire business and property may be entrusted to certain officers and agents with authority to manage and control the same. Certain acts, which do not pertain to the business, must be performed by the stockholders or directors, such as increasing the capital stock, declaring dividends, etc.

Entrusting the president with the management of the entire business is not the delegation of corporate rights and powers, but is a mere authorization of the president to perform, for and in the name of the corporation, the business it is authorized to transact.

IV.   One who reads the record in this case can not, for a moment, doubt that Pulitzer had all the authority the stockholders and directors could confer upon him. He established, owned, and managed the *Post-Dispatch* years before the present corporation was organized. Employees of Pulitzer, who worked on the *Post-Dispatch*, had, on account of their fidelity and capacity, been advanced and promoted to honorable and responsible positions.   These were given nominal interests, and were made directors.   At the organization Pulitzer subscribed for eight thousand, seven hundred and ninety shares, and gave to his wife eight hundred shares and to his brother-in-law four hundred shares, Gibson three shares, Samuel Williams one share, and David W. Wood one share.   By the articles of association Pulitzer was made president and his brother-in-law Davis secretary.   Williams and Gibson were also made directors.   No regular election of officers occurred afterward until April, 1894, at which the same directors and officers were elected, except that White, also an employee, was elected director in place of Gibson.

A certificate of incorporation was issued December 28, 1891.   About the first of January, 1892, a stockholders' meeting was held, at which by-laws were adopted by a unanimous vote of all the stock.

The first and second of these provided:

"The president and board of directors shall govern the company, and when acting with the consent of a majority in interest and numbers of the stockholders, shall have supreme control and power over all its affairs, business, and property; and may regulate or dispose the same as they see fit.   They shall have full power to make all contracts, and generally carry on all the business of the company, or any newspaper published by it.   They shall appoint all officers and agents

of the company, either directly or through the president, and fix the salaries of the same.

"The executive power of the company is vested in the president, but in his absence, refusal, or inability to act he may authorize in writing the vice-president to act in his place."

The board of directors met on the thirteenth day of January, 1892, when the president was expressly authorized to carry out and complete the purchase of all the property of the "*Dispatch* Publishing Company." For this property the shareholders received stock in the present company, by which the entire capital stock was paid. So Pulitzer, as president, was authorized to buy from himself as stockholder, the property of the *Dispatch* Publishing Company. From that day to the eleventh of July, 1894, there were only three meetings of the directors. At two of these officers were elected, and at the third the secretary was given power to receive and receipt for money.

An analysis of the by-laws shows the absolute control Pulitzer reserved over the board of directors. Though himself and the two employees on the *Post-Dispatch* composed a majority of the board, and though these two directors were his most trusted friends, yet the power of the directors could be paralyzed at the will of the majority in interest of the stockholders which he represented. The executive power of the company was vested in him, and even in his absence, refusal or inability to act, his written authority was necessary in order for the vice president to act in his place. He is given power to appoint all officers and agents of the company, and "to fix the salaries of the same."

Pulitzer admits, in his deposition, that he told Jones in effect that independent boards of directors

were "meddlesome," and that a majority of the stock carried with it a "boss-ship."

In reading the voluminous evidence in this record we fail to find a single instance in which the will of the president was disregarded by the board of ·directors. Indeed the record of the board shows but one act was done relating to the business of the company or the duty of its officers from January, 1892, to August, 1894. The business of the corporation was conducted precisely as though it had been the private business of Pulitzer.   The ingenious wording of the by-laws placed it out of the power of the directors to be "meddlesome" or to interfere with Pulitzer's "boss-ship."

And he used his power though always protesting his annoyance and desire to be relieved of it.   He appointed or dictated the appointment of all the principal agents and employes, and fixed their salaries; he directed the policy and management of the paper; he drew out the earnings at will before dividends were declared, speaks of the paper as "my paper," and treats every one connected with it as his employees. Thus by the unamious voice of the stockholders he was given absolute and unlimited control over the affairs of the corporation and the authority was acquiesced in by the directors.

With this governing power over the business of the corporation, which, the evidence shows, was known to plaintiff, the contract was made.   It is not at all remarkable that plaintiff should have negotiated directly with him, instead of the directors, who never interfered or meddled.

After the negotiations had been concluded, and the contract signed, Pulitzer gave plaintiff the following note addressed to Williams, who was then editor of the *Post-Dispatch* and a director in the corporation.

"Dear Mr. Williams: I hereby appoint Col. Charles H. Jones editor and manager of the *Post-Dispatch*. Please instruct every body accordingly.

"Faithfully yours,   JOSEPH PULITZER,

"Jekyl Islan d, Feb. 6th, 1895.        President."

The order was delivered to Mr. Williams on the fourteenth of February and everybody was instructed accordingly. The *Post-Dispatch* was then in charge of Messrs. Williams and White. Both were directors of the corporation, the former being its vice-president. They made no protest to the action of Mr. Pulitzer, but acquiesced therein by installing plaintiff as editor and manager.

In the issue of the *Post-Dispatch* of the fourteenth of February, Pulitzer, over his name, published the announcement of the change in which he says:

"Continued ill-health and loss of sight have rendered it impossible for me to give personal attention to the conduct of the *Post-Dispatch*. I have not been able even to visit the city for many years past. Authority implies duty. I relinquish duties to which I am physically no longer equal at a distance, and responsibilities which should only accompany the actual supervision of affairs. With this day Col. Charles H. Jones, having acquired a proprietary interest in the *Post-Dispatch*, becomes 'its editor and manager with responsibility and control over its columns.'"

In the same issue plaintiff announces his intentions "under my management of the *Post-Dispatch*."

These announcements were read by the stockholders, and they were informed that plaintiff had secured a proprietary interest in, and would thereafter be, the manager "with responsibility and control over its columns." Still we find no protest or objection from stockholder or director. It must be inferred that neither Williams nor White approved of the change of

management, for one of them thereby lost his position, and the permanency of the position of the other was left in doubt. They remained silent because they recognized the power and delegated authority of Pulitzer.

There can be no doubt, we believe, that Pulitzer had authority from the stockholders and directors to make the contract, and thereby to bind the corporation, provided the agreement was itself valid.

V. Is the contract valid and binding on the corporation? Counsel argue that it is not, because against public policy.

We have attempted to show in a previous paragraph that the directors, either by their official action or through the president, had the power to appoint plaintiff editor and manager of the *Post-Dispatch*, and to give him control of the same, and that the contract in that particular is not in contravention of the statute which requires that the property and business of a corporation shall be managed and controlled by directors. The corporation does not, by the contract, divest itself of its organic character or of the powers and obligations incident to its existence as claimed. It is left entirely free to exercise all its organic functions, but it is bound, as an individual is bound, to perform its agreements. Power to control its business does not imply the right to repudiate contracts lawfully entered into.

But it is said that the contract is against public policy, and void for the reason that it couples with a sale of stock in the corporation an agreement to give to the purchaser a position for five years at a large salary and in addition the position of director and president of the corporation.

Counsel cite many cases in support of their position. It is undoubtedly true that an agreement by one stockholder for the sale, directly or indirectly, of an

office in a corporation, or of a permanent position therein "would be against public policy and void," though the contracting stockholder had shares sufficient in amount to give him control in the election of officers. By such agreement he might be required to act contrary to the duty he owed the company and other stockholders. *West v. Camden*, 135 U. S. 507.

Each shareholder in the corporation has a right to rely upon the judgment of all the others, in the election of directors and officers, and any agreement which puts it out of his power to exercise such judgment is against public policy.

An examination of the cases, however, will show that such contracts have generally been declared void for the reason that the duty the stockholder owes to the company and his associates would be thereby violated. *Cone v. Russell*, 48 N. J. Eq. 212; *West v. Camden*, *supra; Fuller v. Dame*, 18 Pick. 472; *Guernsey v. Cook*, 120 Mass. 501.

But a corporation, that is to say, the stockholders and officers, has the right to employ the best expert talent they can secure for the management of its affairs. Success depends upon good management. Personal interest in the manager creates an incentive to succeed.

The successful management of a large daily paper in a city requires the highest degree of talent as well as large experience. One possessing these qualifications is difficult to secure, and commands a large salary. During the year 1894 the *Post-Dispatch* had not been as profitable as in previous years. A change of management was thought desirable, at least by Pulitzer. Plaintiff was possessed of experience, talent and characteristics which were supposed to specially qualify him for increasing the earning power of the paper.

The contract was made with a view of securing his services.

It seems to us that all objections to the contract, so far as it relates to the employment of plaintiff as editor and manager and gives him editorial control, on the ground that it is against public policy, is removed if the directors and stockholders gave it their unanimous assent. The stockholders or directors of a corporation have the right, in the first instance, to dispose of its stock to such persons, as, in their opinion, will be of advantage to it in a business point of view, or to such as will insure its management according to the views of the promoters. It is perfectly manifest that this company was organized with a view of having it managed by Pulitzer. "Continued ill health and loss of sight," says Mr. Pulitzer in his public announcement, "have rendered it impossible for me to give personal attention to the conduct of the *Post-Dispatch*. I have not been able even to visit the city for many years past. Authority implies duty. I relinquish duties to which I am no longer equal at a distance, and responsibilities which should only accompany the actual supervision of affairs."

There is no more reason why the manager selected should not be allowed to purchase an interest in the company, at this crisis in its affairs, than that Pulitzer was allowed, in the original organization, to subscribe for a majority of the stock and thereby secure the power of control. It could make no difference whether the stock was purchased from the company or from the stockholders, provided, of course, that no wrong was done to the company or the other stockholders, or that they gave their unanimous approval.

As has been seen the directors and stockholders, on being informed of the contract, made no objection thereto, but on the contrary immediately installed

plaintiff as editor; and at a meeting of the stock-
holders held on the sixteenth day of March, 1895, by
unanimous vote elected him a director in the corpora-
tion. But, to emphasize the ratification, the new
board of directors, on the same day, elected him pres-
ident. So the contract, in all particulars material to
this controversy, was approved and ratified by all the
stockholders.

Defendants allege that they were not fully advised
of all the terms of the agreement, but their action as
stockholders and directors show that they were ad-
vised that plaintiff had secured from Pulitzer 1667
shares of stock, that he was made editor and manager,
with control of the publication of the paper, and that
he was to be made a director and president; or if they
were not advised they blindly voted as directed by
Pulitzer. If the latter was the case then surely they
ought not to complain.

The contract then stands as though it had been
made by the unanimous vote of all the stockholders.

The only issue involved in this suit relates to the
right of plaintiff under his contract to manage the
paper and control its policy. Whether the stock-
holders or Pulitzer, who still owns two thirds of the
stock, could be required to elect plaintiff a director, is
not involved and the legality of the contract in that
respect requires no consideration.

It seems that Pulitzer, and with him the other
stockholders, soon repented of the contract, and, under
a resolution voted by them, over the protest of plain-
tiff, undertook to modify it in respect to the control
plaintiff should have over the policy of the paper. This
they had no right to do. A corporation has no more
right to repudiate its valid contracts than an indi-
vidual has.

VI. But it is insisted that a court of equity will

not interfere to prevent a breach of the agreement in question, though it is the contract of the corporation and one it had the power to make.

It is urged in the first place that an injunction should not be granted because plaintiff has an adequate remedy at law in an action for damages in case he is denied the right to edit and manage the paper according to his own judgment; second, that there is a want of mutuality of remedy, without which a court of equity will not decree specific performance; and third, that the contract, in substance and effect, is a mere employment of plaintiff as editor and manager of the paper, and equity will never compel an employer, against his will, to retain an employe in his service.

There can be no doubt of the correctness of these general propositions, but do they apply to this contract? In other words, would an action for damages afford plaintiff an adequate remedy? Is there such a want of mutuality in the contract as would prevent a court of equity from enforcing it against the corporation and its directors? Is plaintiff, under the contract, a mere employee of the corporation, whose rights can not be protected by a court of equity?

*a.* Under the contract plaintiff purchased 1,667 shares of stock in the corporation for which he paid $80,000, and in consideration thereof he was to have the "control and management" of the *Post-Dispatch* for five years at an annual salary of $10,000. In addition to his salary he was entitled to receive the dividends on his stock, which were shown to have been large in previous years, though not satisfactory to Pulitzer. The value of the tangible property of a newspaper is insignificant when compared with its business value and earning power. The value of the stock of such a corporation depends very largely upon the ability with which the business is managed. Plaintiff

had confidence in his own ability to manage this paper, for he stipulates that his appointment and salary shall cease, unless the net profits, under his management, would stand the tests imposed by Pulitzer. Plaintiff also had a reputation to sustain, and an opportunity to enlarge it. The management of a metropolitan newspaper also gives to the manager a power and influence among men which is estimated by some as beyond a money value. In this respect it is *pretium affectionis*.

Our statute provides that the remedy by injunction "shall exist in all cases where an irreparable injury to real or personal property is threatened, and to prevent the doing of any legal wrong whatever, whenever, in the opinion of the court, an adequate remedy can not be afforded by an action for damages." R. S. 1889, sec. 5510.

In giving construction to the section this court has held that "the action of injunction may be resorted to, notwithstanding there may be an adequate remedy at law for the injury, in all cases where an adequate remedy can not be afforded by an action for damages as such." *Towne v. Bowers*, 81 Mo. 496; *Bank v. Kercheval*, 65 Mo. 688.

It is perfectly manifest that the control and management of the paper was the chief inducement that actuated plaintiff in entering into the agreement. With the acceptance of the position of editor and manager he gave up his situation on *The World* and removed from New York to St. Louis. He invested his entire capital in the enterprise. His stock was held by the corporation in such a manner that he could not use it for any purpose. The control of the paper was, moreover, a property right, in the nature of a lease, which he had the right to enjoy for five years. Its value to him depended upon the success with which it was managed.

Mr. Pulitzer, who was at the time president of the corporation and manager of the paper, in a letter to Mr. Williams, who was then the editor, in explaining the situation and the reason for the change in the editorial management, says: "I am convinced that your paper needs a stronger hand and permanent head;" and in his announcement of plaintiff's appointment, made in the columns of the *Post-Dispatch*, he says: "With this day Col. Charles H. Jones, having acquired a proprietary interest in the *Post-Dispatch*, becomes its editor and manager with responsibility and control over its columns."

It appears perfectly manifest that, taking from plaintiff the right to manage and control the paper, according to his own judgment, could not be compensated in damages. Every other right acquired rests upon the right to control. It would be impossible to anticipate the effect a successful management might have upon the pecuniary value of the paper and of the corporate stock, to say nothing of the prestige it would give the manager.

Our conclusion is that the contract, and the rights acquired thereunder, are such that a breach of it by defendants can not be compensated by an action at law for damages.

*b*.  Is there such a want of mutuality of remedy as will prevent a court of equity from granting injunctive relief?

Under the contract plaintiff was appointed editor and manager of the *Post-Dispatch*. These duties require personal services which it may be agreed a court of equity could not enforce. It could not by decree compel an editor to write editorials or to give direction to the business. *But this want of power in the courts is supplied in the contract itself.* While Mr. Pulitzer expresses the utmost confidence in plaintiff and his will-

ingness and ability to discharge his duties with fidelity, his own business instincts are too acute to allow the contract to rest in confidence alone. The corporation was organized "for pecuniary profit and gain." (Sec. 2771, subdiv. 11). Mr. Pulitzer does not lose sight of the primary objects to be accomplished. He expressly fixes a pecuniary test of ability and fidelity. The contract provides:

"And it is further agreed by and between the parties hereto, as a test of the ability of the party of the second part to properly manage and edit said St. Louis *Post-Dispatch* that such appointment and salary shall cease and determine in the event that the gross revenues of the *Post-Dispatch* from advertising and circulation combined shall during the year 1895 be less than the gross revenues from the same source combined were for the year 1894. And it is further agreed by and between the parties hereto that said appointment and salary shall cease and determine in the event that the net profits of the *Post-Dispatch* for the year 1896 shall be less than the net profits for the year 1893. And it is further agreed by and between the parties hereto, their executors, administrators or assigns, that in case of the death of the party of the second part, his resignation, failure of health or retirement or inability to perform the duties and labors of editor and manager of the *Post-Dispatch* at any time within three years from the date of the execution of this contract, the party of the first part shall have the option to re-purchase for the sum of eighty thousand dollars the herein mentioned one thousand, six hundred and sixty-seven shares of the stock of the Pulitzer Publishing Company, which, in such event, the party of the second part agrees to sell and transfer to the party of the first part for said sum of eighty thousand dollars."

It is further provided that the appointment and

salary should cease if plaintiff should "at any time during said term accept or occupy any public or political office, elective or otherwise, or engage in any other business of any kind or description."

The test of duty and liability is thus expressly agreed upon which is absolutely determinable and does not depend upon the views or opinions of either party. The failure to come up to the test is followed by a forfeiture of the position and salary. The test is success; the remedy, in case of failure for any of the causes, is removal from position and forfeiture of contract.

Should plaintiff fail to perform his contract according to the tests provided and should then persist in controlling the paper in disregard of the provision that the appointment should cease, there can be no doubt that a court of equity would enjoin his interference just as it can enjoin an interference with his rights if threatened. Keeping in view all the time that the right to manage and control the newspaper is the matter in issue, it is apparent that the remedy is mutual. The question is, are the defendants entitled to the control? A court of equity can answer the question and enforce its conclusions on the petition of either party. Defendants could, undoubtedly, charge by crossbill that plaintiff had failed to perform the conditions of the contract and had forfeited his right to control, and if proved, the court could require plaintiff to allow them to resume control and enjoin an interference with it.

c. The law is well settled that personal contracts for service will not, because they can not, be enforced by courts of equity.

But we do not view the duties to be performed by plaintiff under the contract, as mere personal service or simple employment. In his control and management of the paper he knows no master or employer. He is answerable to no one for the manner of performing his

duty. He is accountable only for the stipulated results. His position gives him a property right in the possession, control and management of the paper he agrees to edit and manage.

A reading of the contract will show that the central idea of the executory part of it is the control and management of the paper. That means the possession and use of the property, and not mere employment to write editorials.

The judgment of the circuit court is affirmed. BARCLAY, C. J., and GANTT and BRACE, JJ., concur. BURGESS, J., does not sit. SHERWOOD and ROBINSON, JJ., dissent.

SHERWOOD, J. (dissenting.)—This proceeding in equity was instituted by plaintiff, Charles H. Jones, against the Pulitzer Publishing Company and Samuel Williams, Florence D. White and S. S. Carvalho, three of its directors, to enforce, by injunction, against its breach, and thus obtain specific performance of a contract entered into by plaintiff on the sixth day of February, 1895, with Joseph Pulitzer. Pulitzer, though named as a defendant, was not served and did not appear.

The contract of which specific performance was thus asked is the following:

"This agreement, made this sixth day of February, in the year one thousand, eight hundred and ninety-five, between Joseph Pulitzer, of the City, County and State of New York, party of the first part, and Charles H. Jones, of the city of St. Louis, State of Missouri, party of the second part.

"WITNESSETH, that for and in consideration of the sum of eighty thousand dollars ($80,000) in cash, and the performance by the party of the second part of the conditions hereinafter set forth, the party of the first

part agrees to sell and deliver to the party of the second part, one thousand, six hundred and sixty-seven (1,667) shares of the capital stock of the Pulitzer Publishing Company of St. Louis, Missouri, being one sixth (1-6) of the total capital stock of said corporation.

"AND, WHEREAS, the party of the first part is induced to make this sale and enter into the covenants herein contained on the assurances of the party of the second part of his ability to fulfill the covenant and conditions and avoid the penalties hereinafter set forth.

"*Now, therefore,* it is agreed by and between the parties hereto, and made a part of the consideration for the sale of said one thousand, six hundred and sixty-seven (1,667) shares of stock, that the party of the second part shall be appointed the editor and manager of the *Post-Dispatch*, a newspaper published in St. Louis, Mo., by the said Pulitzer Publishing Company, for the term of five (5) years from the date hereof, at an annual salary of ten thousand dollars ($10,000).

"And the party of the first part agrees to elect the party of the second part director and president of the Pulitzer Publishing Company aforesaid, and to give him control and management of said newspaper, the *Post-Dispatch*, during the above mentioned period of five years;

"*Provided, however,* that such appointment and salary shall cease and determine if the party of the second part (shall fail to properly perform the duties of editor and manager aforesaid or) shall at any time during said term accept or occupy any public or political office, elective or otherwise, or engage in any other business of any kind or description, it being covenanted by and between the parties hereto that the party of the second part shall devote all the time, ability and energy he possesses to the growth, prosperity and suc-

cess of said St. Louis *Post-Dispatch* (and conduct the same with strictest integrity and economy).

"*And it is further agreed*, by and between the parties hereto, as a test of the ability of the party of the second part to properly manage and edit said St. Louis *Post-Dispatch*, that such appointment and salary shall cease and determine in the event that the gross revenues of the *Post-Dispatch*, from advertising and circulation combined, shall, during the year 1895, be less than the gross revenues from the same sources combined were for the year 1894.

"*And it is further agreed*, by and between the parties hereto, their executors, administrators and assigns, that in the case of the death of the party of the second part, his resignation, failure of health or retirement or inability to perform the duties and labors of editor and manager of the *Post-Dispatch* at any time within three years from the date of the execution of this contract, the party of the first part shall have the option to re-purchase for the sum of eighty thousand dollars ($80,000), the herein mentioned one thousand, six hundred and sixty-seven (1,667) shares of the stock of the Pulitzer Publishing Company, which, in such event, the party of the second part agrees to sell and transfer to the party of the first part for the said sum of eighty thousand dollars ($80,000).

"*And it is further agreed*, that in case of the death of the party of the second part, or his resignation, failure of health, retirement or inability to perform the duties and labors of editor and manager of the St. Louis *Post-Dispatch* after the expiration of the aforesaid three years, and within two years thereafter the party of the first part shall have the like option to re-purchase the aforesaid one thousand, six hundred and sixty-seven (1,667) shares of the stock of the Pulitzer Publishing Company, but in such case the

price, instead of being eighty thousand dollars ($80,-000), shall be such sum as may be fixed as the value of said stock by arbitration. Each of the parties hereto, or their executors or administrators, shall name an arbitrator, and if the arbitrators shall differ in their appraisement, they shall name an umpire and the decision of said umpire shall be final as to the value of said stock.

"(The word 'presidency,' in line 9, page 2, stricken out; the words 'shall fail to properly perform the duties of editor and manager aforesaid or,' between lines 10 and 11, page 2, inserted; the words 'and conduct the same with strictest integrity and economy,' end of line 17 and sub page 3 inserted; words 'death,' line 6, page 3, and word 'death,' line 18, page 3, substituted for words 'default' in both places before execution hereof).

"(In witness whereof the parties hereto have set their hands and seals the day and year first above written).                    "JOSEPH PULITZER,
Witness:                         "CHARLES H. JONES.
      "ALFRED BATES,
      "H. D. MacDONA.
"Glynn Co.,            ⎫
                      ⎬ ss.
"State of Georgia.    ⎭

On the sixth day of February, one thousand, eight hundred and ninety-five, before me personally came Charles H. Jones, to me known to be the individual described in the within agreement, and who acknowledged that he executed the same.

      "(Seal)                "E. G. GROH,
            "Notary Public, Glynn Co., Ga."

Forming part of this contract was a letter dated as above and delivered to Pulitzer prior to signing the contract, as follows:

"JEKYL ISLAND, GA., Feb. 6, 1895.
"*Joseph Pulitzer, Esq.:*

" 'MY DEAR SIR:—I have to say to you by this letter that I take the office of the Pulitzer Publishing Company under the express agreement that I will agree to the adoption of a set of by-laws to be hereafter framed absolutely forbidding any officer of the company from signing notes or similar obligations of the company, that even contracts involving financial obligations must have the board's approval.

"I further agree to take certificates of stock which shall contain written on their face the words, 'This stock is held subject to the terms and conditions of agreements made of even date;' with the understanding that at the expiration of five years new certificates not so indorsed shall be issued to me.

"Yours very truly,
"C. H. JONES."

This was intended to be and was a part of the agreement between the parties, and in partial execution of its terms, the stock sold to Mr. Jones was indorsed across its face, as in this writing provided by Mr. Jones himself.

Before the time this contract was signed, Jones had made repeated attempts while in New York, and while the negotiations were in progress to obtain control of the board of directors of the Pulitzer Publishing Company, by securing a majority of the board; this being refused, Jones shifted his ground by asking to name two of the board, Pulitzer to name two, and then the contracting parties to name the fifth man upon whom they could mutually agree. But all these efforts on the part of Jones to obtain control or even partial control of the board of directors seem to have received their apparent quietus on the first of February, 1895 (just five days before the contract was signed), by

Carvalho, the agent of Pulitzer, writing to Jones a letter which, so far as pertinent, is as follows:

"NEW YORK, February 1, 1895.

"*Col. C. H. Jones:*

"DEAR COL. JONES:—In order that there may be no misunderstanding in relation to the agreement between yourself and Mr. Pulitzer, I call your attention to the following:

"'First.   Mr. Pulitzer reserves the right to name the majority of the board of directors of the Pulitzer Publishing Company absolutely.   He is willing to consider your wishes, if you have any preference, but simply as a question of natural courtesy on his part to cultivate pleasant relationship with yourself—not as a right.'"

This letter was written by authority of, and in accordance with, a telegram from Pulitzer to Carvalho dated at Brunswick, Georgia, January 24, 1895.

The capital stock of the company consists of ten thousand shares of $100 each.   Immediately prior to the execution of the contract, the stock holdings were as follows, viz.:

| | |
|---|---|
| Joseph Pulitzer | 8,796 shares |
| Kate Davis Pulitzer | 800 shares |
| Wm. Leonard Davis | 400 shares |
| Charles Gibson | 1 share |
| D. W. Woods | 1 share |
| F. D. White | 1 share |
| Samuel Williams | 1 share |

F. D. White had also a contract with Joseph Pulitzer for the purchase of two hundred shares on which he had paid above $9,000.   This was by far the greater part of the purchase price, and upon completion of his payments, Mr. White will be entitled to a transfer of the shares.

The one thousand, six hundred and sixty-seven shares transferred to Jones in virtue of his contract were part of those belonging to Joseph Pulitzer.

After the contract was made between Jones and Pulitzer, and before this suit was begun, the defendant S. S. Carvalho acquired twenty-nine shares from Mr. Pulitzer. The *bona fides* of these various stockholdings is not drawn in question.

At the date of the contract the directors of the Pulitzer Publishing Company were Joseph Pulitzer, William L. Davis, Charles Gibson, Samuel Williams and Florence D. White. The officers were, President, Joseph Pulitzer; Vice-President, Samuel Williams; Secretary, Charles Gibson.

Mrs. Pulitzer had owned her stock for many years, the gift of her husband, and had regularly drawn her dividends on her stock.

Davis, the brother-in-law of Pulitzer, owned his shares for some eight years and as a gift from Pulitzer, and had drawn his dividends.

White had bought two hundred shares and had, as a lifetime's accumulation, paid $9,000 or nearly their purchase price on them. But the form of this proceeding necessarily affirms the corporate validity of the defendant corporation.

Jones, after he had received a draft of the contract which was finally executed except changes made by interlineations, was advised by a friend in New York, so he states, that he ought to have a *second contract with the Pulitzer Publishing Company.* And he states also that this subject was the topic of frequent conversations between Pulitzer, Carvalho, Bowers and himself, in which conversations he says they assured him that the contract then in contemplation, and afterward signed, would bind the corporation, but this is explicitly denied by all of the other parties mentioned.

Jones left New York on February 2, 1895, for Jekyl Island. On his arrival at Brunswick, Georgia, and just before he went over to Jekyl Island, he wrote

the following supplemental contract to be executed by the corporation itself in ratification and adoption of the personal contract about to be executed: "This agreement, made this ———— day of ————, in the year one thousand, eight hundred and ninety-five, between the Pulitzer Publishing Company of the city of St. Louis, State of Missouri, party of the first part, and Charles H. Jones of the same city and State, party of the second part, witnesseth, that it is agreed by the parties hereto, that said Charles H. Jones shall become and is hereby appointed editor and manager of the *Post-Dispatch*, a newspaper published in St. Louis, Mo., by the said Pulitzer Publishing Company, for the term of five years from the date hereof, at an annual salary of ten thousand dollars ($10,000), subject, however, to the conditions fully set forth in an agreement entered into this day between Joseph Pulitzer of the city, county and State of New York, and the aforesaid Charles H. Jones, which conditions are hereby expressly made a part of this agreement."

Of this form of contract he says that he simply drew it up *tentatively in order to try his hand in drawing up contracts;* that he drew the document when he was at a hotel in Brunswick, Georgia, on Sunday evening, February 3, when he had nothing else to do, and it was *inadvertently* sent to Pulitzer in an envelope which contained the other papers in the case. This agreement was never executed by Pulitzer as president of the corporation, though Pulitzer states Jones endeavored to procure his official signature thereto. Jones says this draft of a contract was never referred to by them in their conversations on the island. But in this he is directly contradicted by Pulitzer, who states the subject of several conversations between them was respecting the draft aforesaid, and that as often as the sub-

ject came up, he distinctly told Jones that he could not execute a contract which would bind the company; that he had no authority to do so, and would not do it. And it would certainly seem that so important a paper contained in the same envelope would not escape Pulitzer's attention or those of his attorney.

But be that as it may, the drafting of this paper shows very unmistakably that Jones had the thought in his mind which had been suggested by his friend in New York, that a supplemental contract with the corporation was absolutely necessary. There is no refuge from this conclusion.

On the same day the contract now in litigation was executed, Jones' attention was again called to the difference between a *private* and an *official* signature, by the following note:.

"DEAR MR. WILLIAMS:—I hereby appoint Colonel Charles H. Jones, editor and manager of the *Post-Dispatch.* Please instruct everybody accordingly.

" Faithfully yours,

" JOSEPH PULITZER, President.

" Jekyl Island, 6 February, 1895."

This note addressed to Mr. Williams, who was then vice-president of the company, was signed by Mr. Pulitzer as president. Jones denies that the note was thus *officially* signed, but the original was preserved, and exhibited in evidence, and it, *proprio vigore*, neutralizes the denial of Jones, and in addition to that, the testimony of Williams shows that the note of Pulitzer was thus signed when delivered to him by Jones, and further a letter from Pulitzer to Williams dated at Jekyl Island, February 8, 1895, mentions the fact that the note given by Pulitzer to Jones for Williams, was a " brief *official* note."

On the twelfth of February, 1895, on Jones' arrival in New York, he wrote Pulitzer a letter, of which

VOL. 139 mo—4

the following is the material portion: "My Dear Mr. Pulitzer. * * * You asked me to draft the resolution to be adopted by the Board of Directors ratifying the contract between us. I inclose a copy. I think this will suffice without spreading the whole contract on the minutes. It is necessary to be specific enough to identify the contract ratified, and I think this does it without disclosing details, which it is not necessary for the members of the board to know. If satisfactory you can simply wire me at St. Louis, as I have kept a copy.      "Faithfully yours,
                                "C. H. JONES."

The draft of the resolution referred to in the foregoing letter is in Jones' handwriting, and is as follows:

"*Resolved*, That the Board of Directors of the Pulitzer Publishing Company hereby accepts and ratifies the contract between Joseph Pulitzer and Charles H. Jones, bearing date February 6, 1895, whereby the said Charles H. Jones is appointed editor and manager of the St. Louis *Post-Dispatch*, for the term of five years from the date of said contract."

Pulitzer denies that he had requested Jones to draft such a resolution; but, however that may be, the resolution was never adopted by the board, and appears never to have been presented to them for consideration, nor to the stockholders' meeting.

Right here it is not impertinent to observe that the contract in question had been executed as a purely personal one, and that when Jones wrote the letter of February 12, he gave full recognition to this fact, when he prepared the resolution which purported to convert the personal contract into a corporate contract.

In the letter of February 1, 1895, written by Carvalho to Jones, a portion of which has heretofore been quoted, there is also this further portion:

"Second. In reference to the presidency of the company, a set of by-laws for its protection will have to be framed after you receive the presidency. I have your agreement to this; and therefore it is understood that in the instance of your being made president prior to the framing of these by-laws, you will understand they contain restrictions absolutely forbidding any officer of the company from signing notes or similar obligations of the company. Even contracts involving financial obligations must have the board's approval.

"Third. In reference to your control over your subordinates, such information as I have received from Mr. Pulitzer leads me to believe it is his intention to leave you entirely unfettered in this respect.

"Yours very truly,

"S. S. CARVALHO."

On his arrival in St. Louis on February 14, 1895, Jones presented his note to Williams, vice-president and acting editor, and thereupon was by Williams introduced to the editorial staff of the paper and duly installed as editor and manager of the *Post-Dispatch*.

On the fourteenth of February, however, before Jones had been installed, the following announcement appeared at the head of the editorial page of the *Post-Dispatch:*

"ANNOUNCEMENT.

"Continued ill health and loss of sight have rendered it impossible for me to give personal attention to the conduct of the *Post-Dispatch*. I have not been able even to visit the city for many years past.

"Authority implies duty.

"I relinquish duties to which I am physically no longer equal at a distance, and responsibilities which should only accompany the actual supervision of affairs.

"With this day Colonel Charles H. Jones, having

acquired a proprietary interest in the *Post-Dispatch*, becomes its editor and manager with responsibility and control over its columns.

"In facilitating the return of Colonel Jones to the field of his former labors, I feel that I am not only placing this journal in able hands, but am conferring a benefit on the city. His courage and aggressiveness against every form of public wrong, his effective championship of local interests and his natural Democratic instincts are known to me. He will conduct the paper on the line of its successful record, infusing into its management new blood and fresh energy.

"He will continue the paper's battle for all that is true and enlightened, all that is humane and progressive, all that is just, moral, and intelligently conservative in government and society. He will enlist in the ever-continuing struggle against hypocrisy, privilege, class and corruption, and above all he is pledged to maintain the fearless and absolute independence of the paper.                    JOSEPH PULITZER."

Within twenty-four hours after Jones assumed the position to which he had been appointed, the first trouble began; it arose in this way:   Jones took the line at the head of editorial page, "Published by the Pulitzer Publishing Company, Joseph Pulitzer, President," and substituted therefor "Charles H. Jones, Editor and Manager."   This change was immediately wired to Pulitzer, who thereupon wired to Jones a telegram which Jones describes as *"a very hot one,"* and which is contained in the following telegram to Williams:

"BRUNSWICK, GA., February 15th.   To Williams, *Post-Dispatch:* Have sent following telegram to Jones: 'Restore at once at head of editorial page the line Published by Pulitzer Publishing Co., with the additional line, Founded by Jos. Pulitzer.' Telegraph me whether

it is done, and how things are generally.    You are still vice and I president.''    No. sig.

Jones obeyed this *peremptory order* before Williams arrived down town the next morning.    In reference to this matter Jones testifies:

''Mr. Pulitzer had an agreement with me before I left Jekyl Island, and he asked me if I wanted my name at the head of the editorial column, and I told him' I did; I thought that would be an advantage; I thought it was perfectly agreed upon and understood, and I took down that line 'Published by the Pulitzer Publishing Company, Joseph Pulitzer, President,' but I reinstated that line as soon as I learned from Mr. Pulitzer what his wishes were in regard to it.''

Jones does not appear to have *reminded* Pulitzer of the agreement as to the change of the head line.    This little incident, though apparently trivial, is not so small as it seems; it discloses two things very conspicuously: *First*, that Pulitzer did not regard the contract of February 6 as giving Jones absolute control over the paper; *second*, that Jones himself did not so regard it.

The next and more serious trouble occurred in relation to the adoption of a new set of by-laws.    That such by-laws were to be framed had theretofore been agreed upon between Carvalho and Jones, and between the latter and Pulitzer has been already set forth, and that new by-laws *in general* were to be drafted, is admitted by Jones in his testimony.

With this end in view, a stockholders' meeting was called for March 16.    But prior to that time Carvalho came out from New York to St. Louis, and the *Post-Dispatch* being a corporation having its origin in this state, he employed Judge E. B. Adams to draw suitable by-laws in accord with the statutes of this State. This was done, and the by-laws were submitted to

Jones, whose chief objection lay to the fourth one of the series, which is as follows:

. *"Fourth.* The Board of Directors shall govern the company and shall have control of all its affairs. It shall have full power to carry on all the business of the company and to elect and appoint for one year or less all officers, agents and employees of said company and fix their salaries either directly or by resolution delegating the power or any part thereof to the president. The Board of Directors shall have power to suspend, remove or dismiss any officer, agent or employee of the company, whether elected or appointed by the directors or otherwise, and may fill any vacancy in any office of the company. Vacancies in the Board of Directors are to be filled by the stockholders at a special meeting to be called for that purpose."

The old by-law on this subject was as follows: "The president and Board of Directors shall govern the company, and when acting with the consent of a majority in interest and numbers of the stockholders, shall have supreme control and power over all its affairs, business and property; and may regulate or dispose of the same as they see fit. They shall have full power to make all contracts, and generally carry on all the business of the company, or any newpaper published by it. They shall appoint all officers and agents of the company, either directly or through the president, and fix the salaries of the same."

Plaintiff objected to the fourth by-law on the ground that his contract with Mr. Pulitzer gave him (Jones) the *supreme control* and management, and that the control and management conferred on the board of directors by this paragraph was in conflict with his contract with Mr. Pulitzer.

Jones not only made these objections to the fourth by-law, but wrote the following letter in regard to it:

"ST. LOUIS, Feb. 23, 1895.

"Dear Mr. Pulitzer:—As Mr. MacDona and Mr. Carvalho have left, I send to you the comments on the by-laws submitted to me, which I promised. I trust you will consent to such modifications of the 4th by-law, as will not bring it into direct conflict with the contract   *   *   *   .

"Faithfully yours,
"C. H. JONES."

The stockholders' meeting was held on the sixteenth of March, pursuant to notice. All the stock was represented in person or by proxy. Plaintiff attended in person and voted his one thousand, six hundred and sixty-seven shares for the new board of directors, which included himself as one of the number, resulting in the unanimous election of plaintiff, Samuel Williams, F. D. White, Joseph Pulitzer and S. S. Carvalho. The by-laws as framed by Judge Adams were then adopted by the vote of all the stockholders except that of Col. Jones, who caused the following protest to be spread upon the minutes:

"ST. LOUIS, Mo., March 16, 1895.

"I respectfully protest and ask that my protest be put on record, against the adoption of the fourth by-law, for the reason that it conflicts with a contract made February 6, 1895, between Joseph Pulitzer (who is the president and chief stockholder of this company) and Charles H. Jones, in which Mr. Pulitzer agreed to appoint Charles H. Jones as editor and manager of the Post-Dispatch and to give him control and management of the same during the term of said contract; said management and control being an essential consideration of the said contract; and I further protest against the adoption of any by-law or any action of said company or its board of directors, which will in any way conflict with the provisions of said contract.

"C. H. JONES."

Prior to the stockholders' meeting aforesaid, there had been no action taken by any stockholder or director in reference to the contract of February 6, 1895, nor opportunity afforded for such action in consequence of no corporate meetings having been held. Indeed, it does not appear that any of the then directors, except Williams, had ever seen that contract, and he had not seen it until February 19 or 20, and only then to hear it read by Mr. MacDona. It is very noticeable that in the above mentioned protest Jones does not speak of the contract of February 6 as the contract of the Pulitzer Publishing Company, but he speaks of Pulitzer and himself as *individuals*. Nor did he exhibit his contract to his associate stockholders or directors at that meeting, nor disclose what the contents of the contract were, further than what was done by the protest itself. Actuated, it seems, by the spirit of the letter of February 12, which he had sent to Pulitzer in regard to the resolution which the latter had refused to sign, he kept the other directors as much in the dark as possible respecting the litigated contract.

After the adoption of the by-laws, various other matters of business were transacted by the stockholders, and then the following proceedings were had, as shown by the record of the meeting:

"Afterward, Col. Williams offered a resolution which was duly seconded by Mr. Gibson, which is in words and figures as follows:

" 'Resolved, That all acts heretofore and prior to February 1, 1895, done in behalf of the Pulitzer Publishing Company by its president and directors, are hereby ratified and approved.'

"On motion duly seconded, it was resolved by the owners and holders of all the stock of said company that the vote on said last mentioned resolution be taken *viva voce*."

For this resolution, Jones as well as all the rest voted, but subsequently Jones claimed that he had misunderstood the resolution, and supposed that it related to a date which would include his contract of the sixth of February.    Naturally enough the claim made by Jones and necessarily included in his protest, that exclusive control over the corporation was conferred by his contract, aroused much attention and anxiety among the directors and irritated Pulitzer. Consultations followed and interviews occurred and efforts were made to induce Jones to withdraw his protest but without avail.    Thereupon Carvalho, who had been in communication with Pulitzer, received from the latter a telegram dated March 19 of this tenor:

"To Carvalho, Planters House:    Tell Jones that under regrettable circumstances, prospects more wrangling, my object of peace appearing hopeless, I prefer unless he withdraws protest, suspending further relations and submitting case at once to court for judicial interpretation of contract.    This seems manly way." Upon its receipt, Carvalho read this dispatch to Jones, and Carvalho says of him that on hearing it read, *"he was much disturbed."*

Carvalho also conveyed to Jones a proposal from Pulitzer to submit the controversy to a court for legal interpretation, also a proposal to take back the stock and return the money received. These proposals Jones rejected.

Carvalho then went to Judge Adams, showed him the telegram as well as the four resolutions that were subsequently passed at the meeting of the board of directors. As the result of such consultation, Carvalho went to see Jones again, taking with him the resolutions.    After conversing with Jones and reading to him the resolutions hereinafter set forth, and informing him that those resolutions would be passed by the

board of directors at its next meeting on the twenty-first of March, and that as he was appointed editor and manager and president, he would have to be appointed under those resolutions and would have to agree to them, and Jones then said he could not withdraw the protest as it was a matter of record, but having read the resolutions he said he felt he could accept; that he would accept his position under those resolutions and those by-laws.   Being asked by Carvalho to put that in writing, Jones did so as follows:

"ST. LOUIS, MO., March 19th, 1895.
"To S. S. Carvalho:

"I have been, and am now, performing my duties under my contract with Mr. Pulitzer faithfully, loyally and diligently.   I propose to go on performing them in the same faithful and loyal manner until my contract is fulfilled in all its particulars, or so long as I am permitted to do so.   I state to you, Mr. Carvalho, that under these resolutions shown to me, and to be proposed for the adoption of the Board of Directors, I see my way to do my work as president, editor and manager, in a peaceable and mutually satisfactory manner. I am ready to go on with my work under those resolutions as read to me, and in accordance with my contract.   I now repeat the statement and authorize you to convey it to Mr. Pulitzer.

"(Signed)          C. H. JONES."

The resolutions herein referred to are these:

"*Resolved*, That in the future the words 'Founded by Joseph Pulitzer' shall permanently remain at the head of the editorial page of the *Post-Dispatch*.

"*Resolved*, That the traditional character and principles of the *Post-Dispatch* shall remain unchanged under any new management, and that it shall be continued entirely free, independent, and untrammeled by any partisanship or party affiliation.

"*Resolved*, That Col. Charles H. Jones be appointed editor and manger of the *Post-Dispatch* for the current year, subject, however, to the by-laws of this company, and the power of the board of directors, and that his salary be fixed at $10,000 per annum.

"*Resolved*, That until the further order of this board the president is hereby authorized to fix and regulate the salaries of all employees on the *Post-Dispatch*, up to $60 per week, and that he shall have control over the staff; he shall also have control over the editorial columns; provided, however, that said control shall not interfere with the policy of said *Post-Dispatch*, as expressed in the resolution passed by the board of directors this day."

Jones testified that only the *first two* of those resolutions were shown to him, and that it was these that he referred in his letter to Carvalho of March 19, but inasmuch as the trouble about the head line had been arranged and no question as to the preservation of the traditional character and policy of the *Post-Dispatch* had yet arisen, and inasmuch as the very object of the *second two* of the resolutions was to compose differences which had already arisen between the parties as to the fourth by-law and as to Jones' powers over the *Post-Dispatch*, as to whether he should be subordinate or paramount to the Board of Directors, inasmuch as this was the situation of affairs, unless all of the resolutions had been submitted to Jones before he wrote the letter mentioned, that letter would be without force, meaning or significance. These considerations lead to the belief that Carvalho's statement of the matter is the correct one.

The board of directors met on the twenty-first of March, two days after the above letter was written. Plaintiff was elected president, Samuel Williams was elected vice-president, F. D. White was elected treas-

urer, and S. S. Carvalho was elected secretary; all these elections were unanimous. The four resolutions above set out were then adopted. Col. Jones voted for all of them except the one appointing him editor and manager *for one year* at a salary of $10,000 per annum, as to which (being personally· interested) he abstained from casting a vote either way, but he made no objection thereto and filed no protest of any kind, and signed the record as president.

Peace was apparently restored. The authority of the board of directors as the controlling body was apparently re-established and recognized, and things moved along smoothly until some time in the summer of 1895, when the directors and the majority stockholders became dissatisfied with the conduct of the paper in various particulars. Mr. Carvalho, one of the directors and a newspaper man of experience in whose judgment Mr. Pulitzer had confidence, came to St. Louis, looked into matters and consulted with the resident directors, and others in the city. After his return to New York he wrote and delivered to Col. Jones (who happened also to be in New York at the time) letter dated August 31, 1895. To this letter of protest, Jones deigned no reply. ·

Carvalho waited till September 7, when he again wrote Jones as follows:

"*The World*, New York, September 7th, 1895.—Col. Charles H. Jones, Hotel Brunswick, Asbury Park, New Jersey:—In my letter of protest to you as a director of the *Post-Dispatch*. on August 31st, three points are mentioned; namely:

"*First.* That the tone and policy of the *Post-Dispatch* be radically changed on the silver question.

"*Second.* That the tone and policy of the *Post-Dispatch* be radically changed as to its course regarding

the Stone Democratic faction, of which it has become the organ.

"*Third*.　That a more capable business manager be obtained.

"It is vitally important for the welfare of the *Post-Dispatch* that you give an immediate answer as to the first two of these protests, namely, a changed policy on the silver question, and the Stone faction affiliation. It would be pleasanter and more agreeable if you pledged prompt and loyal compliance, to make these changes at once. If, however, you do not pledge prompt and loyal compliance, a meeting of the board of directors will be called, when the matter will be laid before it that it may immediately proceed to take action to protect the *Post-Dispatch* from the danger and folly of its present management.　In reference to the third protest, regarding the business management, that may remain open for the present, but as to the protest regarding the silver policy of the paper, and its factional affiliation, I must request an immediate reply.

"Yours truly,　　S. S. CARVALHO."

After reading the letter Col. Jones said to the messenger, who was instructed to wait for an answer: "Tell Mr. Carvalho that I say I have received his letter, and that there is no answer." Thereupon the following call for a board meeting was issued and a copy sent to all the directors, including Col. Jones, who received it at Asbury Park:　"New York, September 10th, 1895.—Col. Charles H. Jones, Hotel Brunswick, Asbury Park, New Jersey:—Dear Sir: In accordance with request from majority of the board of directors, Messrs. Williams, Pulitzer and Carvalho, you are hereby notified that a special meeting of the Pulitzer Publishing Company is called for Saturday, September 21st, at the *Post-Dispatch* building, St. Louis, Missouri, at 12 o'clock, noon.　　Yours,　　S. S. CARVALHO."

On the twenty-first of September, the day on which the corporate meeting was to be held, this proceeding was instituted to prevent the meeting from being held, and these proceedings were successful in securing a temporary restraining order.

The material portions of the petition are to the effect following that the contract of February 6, 1895, therein set forth, was entered into by Pulitzer with Jones, not only as the act of Pulitzer on his own behalf, but also on behalf of the corporation, the Pulitzer Publishing Company, of which he is president and practically sole owner.

It is not alleged in the petition that the contract aforesaid was ever *ratified* by the company, but it is charged that Pulitzer was president and sole owner of the Pulitzer Publishing Company, and that by himself and his counsel he assured plaintiff that a separate contract with plaintiff was unnecessary, etc., etc.

It is also alleged in the petition that the directors of the Pulitzer Publishing Company were advised of this contract and that it was acquiesced in by all parties connected with the *Post-Dispatch* and the Pulitzer Publishing Company.

Jones also alleges that, at the time of making this contract, it was collaterally agreed between him and Pulitzer that by-laws should be framed in harmony therewith and that a board of five directors of the company should be elected to be composed of the plaintiff and one to be named by him, two to be named by Pulitzer, and a fifth to be a citizen of St. Louis of high character and independence to be selected by Jones and Pulitzer jointly.

The claim is made by Jones that Pulitzer failed to perform the collateral agreement and that at a meeting of the stockholders held on the sixteenth day of March, 1895, by-laws of the company were adopted by the

affirmative vote of Pulitzer's stock, which were inconsistent with the contract. Special complaint is made as to the fourth by-law, heretofore recited.

Complaint is also made that at this stockholders' meeting the directors were not elected in pursuance of the alleged collateral agreement. The directors elected were Jones, Pulitzer, Williams, White and Carvalho. Williams, White and Carvalho were alleged to be employees of Pulitzer and under his control.

Jones alleges that he has performed the contract in every respect on his part and that his management of the paper has been attended with exceptional success. He charges that Pulitzer is seeking to annul the contract by using his dependents in the board of directors of the Pulitzer Publishing Company to embarrass and defeat him in his management and control of the paper, and that the directors of the company now claim that the contract between him and Pulitzer is not binding upon the company, nor upon them as its directors, and that they demand that he shall change the editorial policy of the paper to make it conform to their views, and that they threaten that unless he agrees to do so, they will remove him from his position as editor and manager of the paper.

Jones alleges that he consented to acquire an interest in the *Post-Dispatch* and to undertake its conduct and management solely by reason of the *absolute control* of the policy and management of the paper, which was secured to him by his contract with Pulitzer, and that the successful administration of the paper requires that the editor and manager shall be unembarrassed and unfettered in his control of the policy and conduct of the paper, and that it will be impossible for him to continue his present successful management of the paper unless the defendants are restrained from in-

terfering with him in the performance of his duties under his appointment by Pulitzer.

He asks that the defendant Pulitzer be not permitted under the cloak of the corporate organization controlled by him and through his dependents therein to repudiate the agreement made and perfected by him in good faith, and asks for specific enforcement of his rights of control and management by injunction against the Pulitzer Publishing Company, its directors, servants, agents and employees, restraining them and each of them from interfering with his conduct and management of the *Post-Dispatch*, or with his control over the columns and policy of the paper during the term of his contract.

The defendant's answer contains general and special denials and also pleas of estoppel. They do not deny that such a contract as that contained in the petition was entered into between Jones and Pulitzer, but they insist that it is but the personal agreement of the parties to it, and nowise binding on the Pulitzer Publishing Company or its representatives; they deny that the corporation or its representatives ever ratified or approved the contract, but that on the contrary they repudiated it at the first meeting of the stockholders and of the directors held after the contract was made. They deny the collateral agreement with regard to the enactment of by-laws and the constitution of the board of directors.

It is alleged that such a contract is beyond the power of the company to make and that it is void as against public policy. Also that so far as involved in this proceeding, it is a contract for personal service and can not be specifically enforced. It is also insisted that the directors are charged by the law of Missouri with the conduct of the business of the company, and that they can not by an act of their own relieve them-

selves of this duty, and should not be enjoined from its performance by the court.

A hearing was had upon the merits and a decree entered substantially as prayed by the plaintiff.

The decree of the court amongst other things orders: ·

"That the defendants, Samuel Williams, Florence D. White, S. S. Carvalho and the Pulitzer Publishing Company, and the servants, agents and employees of them, and each of them, be and they are hereby enjoined from interfering with the plaintiff's control and management of the St. Louis *Post-Dispatch*, and from in any manner hindering or impeding him in his duties as editor and manager of said newspaper, during the period ending five years from the 6th day of February, 1895, under terms of the contract of February 6, 1895, set forth in the petition herein, or with plaintiff's control over the editorial policy of said newspaper, or with the performance of his duties as editor and manager under said contract, including the employment, direction or dismissal by him as editor and manager of said newspaper, of any of the subordinates or employees connected with the editorial, news or business departments of said newspaper."·

The appeal of defendants questions the correctness of this decree.   Other facts will be noted or more fully developed as occasion may require.

The foregoing summary of the pleadings and facts, especially of the latter, disclosed by the record, has been deemed unavoidably essential in order to properly understand the case at bar, and the remarks which hereafter make comment upon them, because as the familiar maxim has it, "Out of the facts the law arises."

The facts already set forth seem to present the following questions for determination:

*First.* What was the nature of the contract entered into between Pulitzer and Jones on February 6, 1895?

*Second.* Was that contract, if a mere individual contract, ever ratified or acquiesced in by the corporation defendant?

*Third.* Granting for argument's sake, that ratification of the contract did really occur, is it such a contract as can be specifically enforced?

Of these questions, in their order.

1. What was the nature of the contract, personal or corporate? There are many reasons for saying that the contract was the former, and not the latter, and are furnished by the facts aforesaid. In the first place the contract does not *purport to be a corporate* act. Had it done this, had it been regular on its face, executed on behalf of the corporation by the proper officers and within the scope of its business, it would have been *prima facie* evidence of a corporate act (Beach Priv. Corp., sec. 203), but there are on the face of the contract no *indicia* whatever of corporate action or corporate assumption of obligation. Obviously the same rule must hold here as does in regard to official action by a *public* officer. In a case of that kind occurring in Vermont, it was said with much force:

"It is difficult to see how anyone can act officially on paper, and not so state on the paper." *Spear v. Ditty,* 9 Vt. 282. See, also, *Callahan v. Davis,* 125 Mo. 27; *Howard v. Heck,* 88 Mo. 456, and cases cited.

On the other hand, the contract in question has all the features that pertain to, and the characteristics of, one executed between *individuals;* the parties to it are spoken of and subscribe their names to the contract as such. Not the slightest intimation occurs in the entire document having reference, express or implied, to any

official relation which either party bears to any corporation. The contract under review could not be the contract-of the corporation for the very plain reason that the subject-matter of the contract, to wit, its shares of stock, the company did not own, and in which it could not deal. This stock it is, and none other which Pulitzer contracts to sell, and Jones agrees to buy. Subordinated to this feature of sale and purchase is all else in the contract, and in fact made part and parcel thereof. By its very terms the contract so provides: "It is agreed by and between the parties hereto, and made a part of the consideration for the sale of said 1,667 shares of stock that the party of the second part shall be appointed editor and manager of the *Post-Dispatch*, etc."

The nucleus and principal subject-matter of the contract is the stock, 1,667 shares of the Pulitzer Publishing Company, which Pulitzer contracts to sell and which Jones contracts to buy for $80,000.

Clearly the company could have no interest in such a purely personal transaction. But as already seen, the payment of the sum just mentioned is not the *sole* consideration paid for the stock, because the contract further recites: "That for and in consideration of the sum of eighty thousand dollars ($80,000) in cash and the performance by the party of the second part (Jones) of the conditions hereinafter set forth, the party of the first part (Pulitzer) agrees to sell and deliver to the party of the second part, one thousand, six hundred and sixty-seven (1,667) shares of the capital stock of the Pulitzer Publishing Company, of St. Louis, Missouri, being one sixth (1-6) of the total capital stock of said corporation.

"And, whereas, the party of the first part is induced to make this sale and enter into the covenants herein contained on the assurances of the party of the

second part of his ability to fulfill the covenants and conditions and avoid the penalties hereinafter set forth.

"Now, therefore, it is agreed by and between the parties hereto, and made a part of the consideration for the sale of said one thousand, six hundred and sixty-seven (1,667) shares of stock, that the party of the second part shall be appointed editor and manager of the *Post-Dispatch*, a newspaper published in St. Louis, Mo., by the Pulitzer Publishing Company, for the term of five years from the date hereof, at an annual salary of ten thousand dollars ($10,000)."

Under the conditions thereafter set forth, Jones' acceptance of the position of editor and manager is a consideration moving to Pulitzer and one of the inducements to the sale of stock by him.   On his part, Jones is to devote all his time and energies to the paper, to conduct it with strictest integrity and economy, and besides, meet certain financial tests which the contract prescribes.   All these exertions on his part, however, constitute but a part of the consideration for the stock which he purchased.

Another proviso of the contract, to wit, that Pulitzer will elect Jones director and president of the company, and that on the happening of certain contingencies, Pulitzer shall have the right to repurchase the stock, are all of them naught else but *personal;* it would be out of the reach of the company to perform any of them, even if ever so desirous of doing so. Thus throughout the entire contract Jones' performance of "the duties and labors of editor and manager" is a consideration expressly stipulated to be for *Pulitzer's profit;* three times does the contract affirm that Jones is to be editor and manager *as a consideration moving to Pulitzer, and as part payment of the stock.* The only portion of the contract in which the company had an interest, or which if made in the corporate

name and on its behalf, it could perform, is that portion relating to Jones' employment as editor and manager; this, however, is by no means an independent engagement, but expressly constitutes part of the stock transaction, and is indissolubly blended therewith.

Again, to state the matter in a more condensed form: In a former contract, Jones had proposed to Pulitzer to pay $100,000 for the same amount of stock he was now getting, by the present contract for $80,000 or $20,000 less so far as *money* was concerned, but in addition to cash payment and in lieu thereof, he was to make part payment in services as editor and manager of the paper by performing "the duties and labors" of that position for five years at $10,000 per year if Pulitzer would put him in a position to do so. In other words, the labors and duties of editor and manager and the payment of $80,000 were considerations for *Pulitzer'z benefit*, and the *one thousand six hundred and sixty-seven shares of stock and the salary of $10,000 per year were the considerations moving to Jones*.

The correctness of this view finds further support, confirmation and emphasis in the seventh paragraph of the contract to the effect that if Jones within three years fails in any sense to perform the "duties and labors of editor and manager" Pulitzer is to have the right to repurchase the stock at $80,000, and why? Because the stock had not been paid for at its full value by just the said sum required for its repurchase. This idea finds further illustration in the eighth paragraph, for this provides that if after three years of service by Jones and then he should fail, etc., Pulitzer may repurchase at appraised value. That is, Jones having paid by labor the additional and major part of the consideration is to receive the full value of the stock in case of Pulitzer's repurchase. This discussion may perhaps serve to illustrate, to make plain and promi-

nent the thoroughly personal nature of the contract being examined. And if further proof were needed to confirm it, it would be found in Jones' own contemporaneous acts, statements and writings. He admits that the subject of whether the contract was a personal one or not was the topic of frequent conversations, between himself, Carvalho, Pulitzer, Bowers and MacDona, who assured him that the contract would bind the corporation. This is substantially the averment in the petition. But Bowers testifies that he never uttered such a word to Jones, and had nothing to do with the second contract, that is of date February 6, nor conversed with Jones about it, and would not in any event have told Jones that the contract in suit would bind the corporation, because such a statement would not have been true. Pulitzer, Carvalho and MacDona testify that they told Jones exactly the reverse of the assertion that the contract would bind the company.

MacDona's testimony in this regard is confirmed in quite a singular way. Jones in his *vivo voce* testimony had said in substance that a friend in New York had told him that it would be proper to have a second contract from Pulitzer as president of the company; that this was said on February 1, 1895, when he had received a draft of the contract ultimately executed. Next day Jones started for Jekyl Island. Asked if when on the island he did not speak to MacDona about the same thing (to wit, a supplemental contract from the corporation), he answers, *"Not one word."* Mac-Dona, however, a disinterested witness, who acted as the attorney for Pulitzer on the island, when the contract was signed February 6, and whose deposition was taken long before Jones took the stand, and therefore could not anticipate what Jones would subsequently say, testifies: "He (Jones) signed his name to an indorsement on the certificates, about their being non-

negotiable, and then when it was all at an end he asked me about whether that contract would bind the company. I told him I did not think it would. He told me this man, naming somebody in New York, had told him the same thing, and another contract would be necessary. 'Well,' I said, 'It does not take a lawyer to find that out.' I said, 'This is a personal contract. However, you have got to take advice from your own counsel; I only represent Mr. Pulitzer in this matter between yourself and himself, this is a personal contract.' I said, 'But that seems to be a matter of very easy arrangement, a resolution or anything like that will settle it, but you will have to consult your lawyer about it.'"

Now, how could MacDona know what Jones' friend had told him in New York about a supplemental contract unless Jones had afterward told him on Jekyl Island, just as MacDona says he did do?

As already seen, Jones did not *afterward* press any longer for a "*supplemental contract*" by the corporation, as recommended by his New York friend, but drew a *resolution* in lieu of it, and erroneously fathered it on Pulitzer, instead of MacDona.

What has been heretofore observed abundantly shows that the contract was wholly personal and was so intended to be, at least by *Pulitzer*. But even if Pulitzer had *otherwise intended*, nevertheless the contract as drafted and signed, despite that intention, would still have been only personal, regardless of who owned a majority of the shares of stock in the corporation, and for these reasons:

"The stockholders can not enter into contract with third persons. Contracts between the corporation and third persons must be entered into by the directors and not by the stockholders. The corporation, in such matters, is represented by the former and not by the

latter.   Such is one of the main objects of corporate
existence.   To the directors are given the management
and formation of corporate contracts.   The stockholders
can not, in meeting assembled, bind the corporation
by their contracts in its behalf.   Although one person
owns a majority of the stock, or all of it, or all but two
shares, he does not in consequence thereof acquire the
right to act for the corporation, or as the corporation,
independently of the directors.   One person may own
all of the stock, and yet the existence, relations and
business method of the corporation continue." 2
Cook on Stockholders, sec. 709.

In *American Preservers' Company v. Norris et al.*,
43 Fed. Rep. 711, the Taylor Manufacturing Company,
a Missouri corporation, having been advised that it
could not enter into a trust, conveyed its plant to Tay-
lor and Norris, its principal stockholders, who in turn
transferred it to the American Preservers Company,
another Missouri corporation and the representative of
a trust.   As part of the transaction Taylor and Norris
agreed that they would not again directly or indirectly
engage in the business.   But afterwards, the Taylor
Company built a new plant and resumed operations.
Thereupon the American Company brought suit against
the Taylor Company and Taylor and Norris to enjoin
them.   The injunction was denied, the court saying:
"The agreement in question professes on its face to be
the individual contract of L. E. Taylor, E. R. and
James N. Norris, with the trustees of the American
Preservers' Trust; and it can not be construed as the
contract of' the Taylor Manufacturing Company with-
out the aid of extrinsic proof, which has not been fur-
nished, even if such proof is admissible.   Evidently,
therefore, the contention that the Taylor Manufactur-
ing Company is bound by the agreement must rest
wholly on the ground that Messrs. Taylor and Norris

are its largest stockholders; that the business of the company inures mainly to their benefit; and that, by virtue of their relation to the corporation as principal stockholders and officers, they have power to control its action, and are bound to so control it as to harmonize with their own individual contracts. Such relation on their part to the company is clearly not sufficient to cast on the corporation the burden of discharging any obligation that such stockholders in their individual capacity may have assumed. As officers and directors of the corporation, it is their duty to serve the interests of the corporation, considered as a distinct entity. It is familiar law that a corporation has a personality of its own, distinct from that of its stockholders; that it is not affected in the most remote degree by contracts made by its stockholders with third parties, whether they own much or little of its capital stock, and is not bound to discharge any personal obligations assumed by its stockholders. *Pullman's Palace Car Co. v. Railroad*, 115 U. S. 587; *Moore & Handley Hardware Co. v. Towers Hardware Co.*, 87 Ala. 206; *Davis Wheel Co. v. Davis Wagon Co.*, 20 Fed. Rep. 700."

In *Humphreys v. McKissock*, 140 U. S. 304, the question is considered at some length. The court say:

"Both the commissioner and the court, in confirming his report and entering the decree mentioned, seem to have confounded the ownership of stock in corporation with ownership of its property. But nothing is more distinct than the two rights; the ownership of one confers no ownership of the other. The property of a corporation is not subject to the control of individual members, whether acting separately or jointly. They can neither incumber nor transfer that property, nor authorize others to do so. The corporation—the artificial being created—holds the property,

and alone can mortgage or transfer it; and the corporation acts only through its officers, subject to the conditions prescribed by law. In *Smith v. Hurd*, 12 Metc. 371, 385, the relations of stockholders to the rights and property of a banking corporation are stated with his usual clearness and precision by Chief Justice SHAW, speaking for the Supreme Court of Massachusetts, and the same doctrine applies to the relations of stockholders in all business corporations. Said the chief justice: 'The individual members of a corporation, whether they should all join, or each severally, have no right or power to intermeddle with the property or concerns of the bank, or call any officer, agent or servant to account, or discharge them from any liability. Should all the the stockholders join in a power of attorney to anyone, he could not take possession of any real or personal estate, any security or choses in action; could not collect a debt, or discharge a claim, or release damage arising from any default; simply because they are not the legal owners of the property, and damage done to such property is not an injury to them. Their rights and their powers are limited and well defined.' "

A case strikingly in point and strongly resemblant of the one in hand, is that of *Guernsey v. Cook*, 117 Mass. 548:

Cook and Beebe owned a majority of the stock of the India Company. Cook, with Beebe's concurrence, made a contract with Guernsey employing him as treasurer of the company at a salary of $3,500 per year; also selling him one hundred shares at par. It was agreed that if for any reason it should become desirable to dispense with Guernsey's services as treasurer, he should have thirty days' notice and his stock should be re-purchased at the price he had paid with interest. In the contract Cook described himself as "president

and representing the India Company." On this appeal the question was whether the contract was that of Cook or of the India Company. The court said:

"We are of opinion that the instrument declared on is the contract of the defendant personally and not of the India Company. It is not executed so as to bind the company. It is signed by Cook without any addition indicating that he was acting as an officer or agent of the company. The fact that the contract is in form a personal promise of Cook is very strong, if not conclusive, evidence that it was intended that he should be bound by it. *Simonds v. Heard*, 23 Pick. 120; *Morell v. Codding*, 4 Allen, 403; *Fullam v. West Brookfield*, 9 Allen, 1. But the terms of the contract show that such was the intention of the parties. The principal stipulations of the contract, as to the plaintiff's purchase of one hundred shares of the stock of the company, as to the terms upon which it was to be reconveyed to Cook and Beebe if the plaintiff should cease to be treasurer, and as to his rights in any proposed sale of stock, are all matters which do not concern the company, and in which Cook and Beebe alone are interested. To hold the company bound by promises in which it has no interest there ought to be unequivocal evidence that such was the intention of the contracting parties."

On a subsequent appeal it was held that the contract was void as against public policy.

In *England v. Dearborn*, 141 Mass. 590, it was held that a person who held all, save two, of the shares of a corporation and was besides its president, treasurer and general manager, could not lawfully mortgage its property without the assent of its board of directors.

In *Pullman Co. v. Railroad*, 115 U. S. 587, it was held that though one railroad company owns nearly all the stock of another corporation it can

not act or contract for the latter except through the board of directors, and if the directors of the independent company act contrary to the wishes of the dominant one, the latter has no power to prevent it and has no means of enforcing its wishes, except by the election of other directors at the proper time and in the proper way.

In *Hopkins v. Lead Co.*, 72 Ill. 373, it was held that a sale of leases and lands belonging to the company by its majority stockholder though made in its name is not binding upon it. He could control the action of the company through its power to elect its officers, but the company could only act through its proper officers.

To the like effect see *Button v. Hoffman*, 61 Wis. 20; *Hill v. Rich Hill Coal Mining Co.*, 119 Mo. 9, and cases cited; *Allemong v. Simmons*, 124 Ind. 19; *Besch v. Western Carriage Co.*, 36 Mo. App. 333; *Pfeiffer v. Lansberg Co.*, 44 Mo. App. 59.

This court in *Hill v. Rich Hill Coal Mining Co.*, 119 Mo. 9, has given full recognition to the doctrine announced in the foregoing cases, that directors are the governing body of the corporation, and can not represent or bind the corporation except when duly assembled and acting as a board and not otherwise, and the fact that one of the directors held a majority of the stock, that this did not give him the right to disregard the rules of law which govern in such cases and substitute his own will therefor.

2. Was the contract, if an individual contract, ever acquiesced in or ratified by the corporation?

It really seems after reading the evidence in this case like a work of supererogation to answer the above question. Of course ratification means an affirmative act; acquiescence a negative one or series of acts partaking of the nature of laches. Obviously, however,

no ratification was needed of the act of appointing Jones editor · and manager, since this was done by Pulitzer as president of the company and who, by the by-laws, was clothed with the executive power thereof, but Pulitzer's note of appointment did not specify any length of time or amount of compensation and was, as Pulitzer testifies, only intended as a temporary appointment.

But the matter in controversy here is not the appointment, but the contract itself; was it ratified? That there was no ratification of the contract abundantly appears at every turn we take through this voluminous record.

In the first place full knowledge of the whole contract was the indubitable prerequisite of its ratification, and evidence of such knowledge should be clear. *First Nat. Bk. v. Gay*, 63 Mo. 33; Story, Agency, sec. 239. In a word, a *fraction* of knowledge can not beget an *integer* of ratification.

Now what knowledge (aside from Pulitzer) did the then stockholders and directors have of the contract? . Outside of the one just mentioned there were Mrs. Pulitzer, Davis, White, Gibson and Williams. There is no testimony whatever that Mrs. Pulitzer, a large shareholder, had any notice or information whatever as to the existence of such a contract. Davis, who owned and had owned for some eight years four hundred shares of stock, had never seen the contract nor was aware of its provisions even when testifying as a witness in this cause. White, a director and a shareholder of two hundred shares (on which he had paid $9,000, his lifetime savings and nearly all that was due), did not see the contract until this litigation began. He had heard that Jones had bought a controlling interest in the paper, but afterward was informed by Williams that this was not true, that Pulitzer

remained the owner of the majority of the stock, etc., but Williams did not tell White what the contents of the contract were.

Gibson, another shareholder and director, had never seen the contract or had known of its existence until the latter part of February or the first of March, and even then it does not appear that Gibson examined or made himself familiar with the contract.

Williams did not know what the contract was until February 19 or 20 and only heard what purported to be a copy of the lengthy document read over to him by MacDona at the Southern hotel. Williams testifies that MacDona held it in his hand and read it. "I did not altogether like that, at the time. I was a little suspicious. There seemed to be a general disposition all around to keep us here in the dark." This seems to have been quite in line of Jones' policy as indicated in his letter to Pulitzer of February 12 which inclosed the resolution already quoted, that is "specific enough to identify the contract ratified," "without disclosing details which it is not necessary for the board to know."

So that if full knowledge is the legal as well as the logical antecedent of ratification, then no ratification was possible in this case by the shareholders when they assembled at the shareholders' meeting on the sixteenth of March.

And besides, the rule of law is understood to be that in order to a valid ratification by shareholders of an unauthorized act, such ratification must consist in the *unanimous* consent of the shareholders, and that nothing short of this will suffice. 1 Morawetz, Priv. Corp., sec. 228; 2 *Ib.*, sec. 625.

So that if ratification must have its foundation of knowledge, and if unanimous consent of the shareholders is always a *sine qua non*, then as Mrs. Pulitzer,

Davis, and White were not possessed of any knowledge of the contract, there was no unanimous consent and therefore no ratification by all the shareholders.

But there was no ratification by the shareholders for the far better and affirmative reason that the fourth by-law adopted by the shareholders' meeting on the sixteenth of March was an absolute repudiation and. rejection so far as concerned corporate action, of the personal contract between Pulitzer and Jones. And this repudiation and rejection over Jones' protest, can not be tortured into a ratification by the assertion that Jones was elected director at the same meeting. Owning, as he did, one sixth of the shares, it was but natural that a directorship should be offered and conferred upon him. And it is conspicuously observable as heretofore commented on, that in this protest Jones does not pretend that his contract with Pulitzer is other than personal, in fact he does not mention it in any other way. Nor does he venture even so much as to offer his resolution of ratification, which he asserts Pulitzer asked him to draft, but which assertion Pulitzer denies.

After the adjournment of the shareholders' meeting, four resolutions were shown Jones which he was told would be offered at the meeting of the board of directors on March 21; that he would have to be appointed under these resolutions and consequently would have to agree to them. Thereupon Jones wrote the letter of March 19 copied above, in which he stated that he could and would work as president, editor, and manager under the resolutions in a peaceable and mutually satisfactory manner. Now, Jones asserts that only the *first two* of the resolutions heretofore set forth were shown him, but for reasons previously given, Carvalho's version of the affair must be regarded the

correct one.   These resolutions, for the sake of convenient reference may be thus epitomized:

The first required that the line "Founded by Joseph Pulitzer" be kept at the head of the editorial page, was a demand that Pulitzer be recognized as a factor in the paper's life and work.

The second held the paper to its traditional character and pledged it to a free, independent course, untrammeled by partisanship or party affiliation.

The third, instead of recognizing the claims of Jones, simply appoints him editor and manager *for the current year*, subject to the by-laws and the power of the board of directors.

The fourth, voted for by Jones, vests in "the president" authority to fix the salaries and to control the paper, subject only to the paramount authority of the board.   This was voted for by Jones.

When the board of directors met, by unanimous vote Jones was elected president; Williams, vice-president; White, treasurer; Carvalho, secretary, and the resolutions were adopted, Jones voting for all of them except .the third in which being personally interested and therefore disqualified, he did not vote, but he made no objection and filed no protest, and attested all of the resolutions in his capacity as president, and they extend to him the only recognition ever accorded to him by the company, and every one of them was an act of management and control.

Surely none of these resolutions in the slightest degree tends to *ratify the contract*, on the contrary they give it decided repudiation.   More than that, not only was the contract rejected by the company, but by his letter of March 19 and by his acceptance of the office of "editor and manager for the current year, subject to the by-laws and the power of the board of directors," Jones was absolutely *estopped* from making or

enforcing any further claim against the corporation based on the contract with Pulitzer. Nothing can be clearer than this unless, indeed, the doctrine of estoppel, that conservative salt of the law, "have lost his savor."

3. Having thus ascertained that the contract was the personal one of Pulitzer and Jones, and was never ratified nor acquiesced in by the corporation, we are thus brought to consider our third interrogatory, viz.: Granting, for argument's sake, that ratification of the contract really did occur, is it such a contract as can be specifically enforced?

The lower court held, and properly held that the construction put on the contract by the counsel for defendants was the correct construction in holding it to be the *personal contract* of Pulitzer, and not that of the Pulitzer Publishing Company. But it held further that inasmuch as the board of directors could not make such a contract, that *a fortiori* it could not ratify it. Yet, nevertheless, it proceeded to enforce specific performance of that contract against the *corporation*, and in the decree for that purpose is to be found the following: "And defendant Pulitzer, not having been served with process herein, and no appearance having been entered on his behalf, the cause as to him is dismissed." Upon this ruling of the court, counsel for defendants very acutely observe: "We venture to say that the action of the court in this respect is without precedent; it enforces the contract of a person who is not a party to the suit, against a third person who is not a party to the contract."

The lower court evidently proceeded upon the theory indicated in its opinion that though *at law* a stockholder holding a majority of the stock could not bind the corporation by his contract, yet that *in equity* he might do this, etc.

There are exceptional cases where a corporation organized for the express purpose of perpetuating *a fraud, ex gr:* where a person has contracted that he will not do a certain act, he will not be allowed to form and control a corporation in order that *it* may do the act contracted against. There a court of equity will interpose. 2 Cook on Stockholders, sec. 663*a*, and cases cited.

But in a note to. that section, the learned author says: "Unless there is a positive allegation and proof that the corporation was *fraudulently formed to violate the individual contract,* the suit will fail." Citing, *Moore, etc. Co. v. Towers,* 6 S. Rep. 41.

But there is no allegation of fraud in this case, and consequently the doctrine just announced has no application in the present instance.

There is another class of authorities cited by counsel for plaintiff relating to modern corporation trust cases, which are equally as inapplicable to the circumstances here presented as the cases just noted.

Outside of these exceptional instances, courts of equity *follow the law,* and their powers are no more. flexible to overthrow well established common law or statutory rules than are those of courts at law, and no precedent can be found establishing the contrary.

Endless confusion and injustice would inevitably result from an opposite course of procedure or theory of action. Stockholders would become the private and joint owners of the corporate property, would assume the powers of the corporation, supersede its functions and dispose of the corporate property for their own benefit, and without incurring personal liability. *Button v. Hoffman,* 61 Wis. 20.

The only way to prevent such consequences is to respect and enforce that well settled rule of law which compels a corporation to preserve its identity and act

through its regularly constituted officers and agents. And in this connection it is proper to observe that it will not do to say that the corporation defendant is a *"dummy"* organization. If so, then it would result that in all cases where one stockholder holds a large majority of the stock, that the corporation however regularly organized would be a "myth," which is clearly at war with the adjudications cited under the first paragraph of this opinion.

Besides, plaintiff having instituted this proceeding against three of the defendants as the directors of the corporation and against the corporation, will not now be permitted to change front and claim anything to the contrary of what he in his petition has solemnly alleged.

And the like line of remark applies to several of the stockholders. Mrs. Pulitzer and Davis had, it is true, their stock given to them by Pulitzer years ago, and on which they have since drawn dividends, yet their holdings, though gratuitous, are just as valid as if bought and paid for; no creditor of Pulitzer could now question their validity. And as to White, having bought his two hundred shares for $13,000, and paid $9,000 of that sum, he has an equity, which is impregnable to all assaults, *made of course in a lawful manner*. With these prefatory remarks, we proceed to discuss and to answer the present interrogatory: Is the contract such an one as can be specifically enforced?

*a.* The rule governing the specific enforcement of a contract requires that it must be certain and definite, just and fair in all it parts; its must be mutual, its enforcement must not be productive of hardship or injustice nor compel a party to an illegal act, nor must the enforcement of the contract be against public policy.

"Although a contract may contain a full recital of everything to which the parties agreed, yet it may be so ambiguous as to one or more of its material terms, as to fail to express the intention of the parties with requisite precision. If there be strong doubt whether both parties to a contract understood it alike, the court will not decree specific performance. It has even been held that where one of them proves that he understood the agreement in a different sense from the other, the court will decline to interfere, without considering whether or not the defendant's construction is reasonable." Waterman on Spec. Perf., sec. 152.

"A contract means *consensus ad idem.*" Lord Westbury puts it thus in the case of *Chinnock v. Marchioness of Ely:* '"An agreement is the result of the mutual assent of two parties to certain terms, and if it be clear that there is no *consensus*, what may have been written or said becomes immaterial. 4 D. J. & S. 638; 1 Beach, Mod. Contr., sec. 65.

Here Jones contends that the contract as understood by him, gave him as editor and manager "absolute" control, while Pulitzer contends he understood the contract in an entirely different way. Inasmuch, therefore, as the minds of the parties never met on this material point, specific performance of the contract can not be awarded, provided always that the precedents of the law be followed.

*b.* But the contract did not clothe Jones with powers as comprehensive as claimed by him. The word *"absolute"* is not found in the contract, and section 2772, Revised Statutes 1889, provides that "the property or business of the corporation shall be *controlled and managed* by directors, not less than three nor more than thirteen in number, who shall respectively be stockholders in such corporation, and one of whom shall be a *bona fide* citizen of this State, to be

elected by ballot, by the shareholders in such corpora-
tion.'' The section further provides for the election
of such directors for one year, and not to exceed three
years.

Now the law is well settled that whatever the law
will imply in a contract is as much part and parcel
thereof, as if set forth in terms therein. Lawson on
Contracts (c), sec. 33; *Whincup v. Hughes*, L. R. 6 C.
P. 84; *Hudson Co. v. Penn. Co.*, 8 Wall, 276; *State v.
Board*, 108 Mo. 242.

When parties make a contract it is presumed to be
done in subordination to existing law, and not other-
wise, and will be construed accordingly. And where
a contract is susceptible of two constructions, one
making it legal and the other illegal, courts will adopt
the former. *Hobbs v. McLean*, 117 U. S. 567; *Guern-
sey v. Cook*, 120 Mass. 501; *Wiggins Ferry Co. v. Rail-
road*, 128 Mo. 245. The provisions of section 2772,
*supra*, must therefore be regarded as contained in the
contract under review.

The mere fact that Jones is given the ''control and
management'' of the *Post-Dispatch* by no means gave
him the ''absolute'' control of the concern. As well
might a general manager of a railroad assume to be
supreme because given extensive control over a large
system of railways, and yet he remains subject and
perfectly obedient to the board of directors, not be-
cause he perhaps is not as well fitted for the supremacy
as they are, but because the law commands that he
yield obedience to the powers created by the law, and
he does it. Not only is this the true and legal con-
struction of the contract, but Jones, under and by his
supplementary concurrent agreement of even date with
the principal contract expressly bound himself to ''agree
to the adoption of a set of by-laws to be hereafter
framed absolutely forbidding any officer of the com-

pany from signing notes or similar obligations of the company, that even contracts involving financial obligations must have the board's approval.''    Under the explicit terms and provisions of this solemn contract he forbids himself and he is thereby forbidden to employ any person or to incur any financial obligations unless by consent of the board.    And yet this agreement, *by his own confession, Jones has trampled under foot.*    White and Steigers he discharged and employed others in their stead, not deigning to consult the board, in fact as he himself testifies:    ''Without regard to their right to say whether I should employ this man or that.''

Hitherto, it had always been supposed necessary in a suit for specific performance that the plaintiff should, on his part, have performed the contract, and this on the well known maxim that ''he who seeks equity must do equity.''    22 Am. and Eng. Ency. of Law, 1035.

Yet in the face of his pronounced and self-confessed disregard of his own contract, Jones is granted, by way of perpetual injunction, a decree of specific performance which makes him the absolute manager and controller of the *Post-Dispatch* and all its business.

Thus was the covenant aforesaid of Jones' of equal rank and validity with the residue of his contract, as well as what the law for reasons aforesaid, would imply that contract to contain, absolutely nullified by the decree of the court, and the board of directors deprived of their express statutory authority, and the legal entity and organization of the corporation utterly ignored.    In brief the corporation with all its sacred and preservative trust functions has been destroyed; has ceased to exist as a corporation aggregate, and by a species of *judicial procreation* has become a corporation *sole*, with Jones as the *sole corporator*.

*c.* But aside from anything heretofore said, the contract can not be enforced because so conspicuously lacking in that essential and predominant feature in a contract which is made the basis for invoking equitable interposition, to wit, *mutuality*. A contract in order to be mutual must be such that it might at the time it was entered into have been enforced by either of the parties against the other of them. For instance, a purchaser from a person who at the time of the sale had no estate in the property sold, may defend himself on the score of the vendor's original incapacity to perform his part. For a like reason an infant can not sue because he could not be sued for specific performance. Fry, Spec. Perf. [3 Ed.], secs. 440, 441.

"In other words, there must be mutuality both as to the obligation and the remedy." *Glass v. Rowe*, 103 Mo. 539.

So, also, in *Marble Co. v. Ripley*, 10 Wall. 359. The court, in passing on this topic, said: "Another reason why specific performance should not be decreed in this case is found in the want of mutuality. Such performance by Ripley could not be decreed or enforced at the suit of the marble company, for the contract expressly stipulates that he may relinquish the business and abandon the contract at any time on giving one year's notice. And it is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former." And specific performance was there refused.

In this case there are not present in the contract either mutuality of obligation or remedy. Without

any breach of his contract, Jones is at liberty to *quit when he will*, undeterred by any prospective action of damages, because none could be maintained against him.    In the event of Jones' quitting, *Pulitzer*, not the *corporation*, would have the right to repurchase Jones' stock at a price dependent in its amount on the time of his departure.    Indeed, it may be said that the contract contemplates the resignation of Jones at any time.    And it will not do to say, as has been said, that there is no lack of mutuality of remedy because, if Jones does not perform his contract, *it may be terminated*.    But it has not hitherto been held that the right of terminating a contract is tantamount to its performance, and even if it had been thus held, this mutuality of remedy would not supply the other indigenous and indispensible ingredient in the contract, to wit, mutuality of obligation.    Here the company is bound by both these strong ties aforesaid of the contract; Jones by neither.

Courts of equity have not been accustomed in the past to grant specific performance of such unilateral contracts.

*d.*    Under the construction put upon the contract by the lower court, Jones "in his control and management of the paper knows no master or employer." This being the case if Jones, in his unfettered and unfetterable conduct of the paper, should cause libel suits to be brought and judgments recovered against the corporation (*Johnson v. Dispatch Co.*, 65 Mo. 539), then the shareholders, ratably, will have to pay for Jones' torts.    And so it will come to pass that Mrs. Pulitzer, White, Davis, the last named of whom was not either stockholder or director at the time of the directors' meeting on March 21, and the others of whom never were apprised at that time nor on the sixteenth of March of the contents and nature of the

contract, and therefore can not be presumed to have ratified it, will have to respond in damages whenever Jones so wills it.    And this, although Jones will own but one sixth of the stock after his reign of five years expires.

Meanwhile he may wreck the corporation by financial or other mismanagement, but protected by the ægis of a mandatory and perpetual injunction, none may say him nay or stay his hand.    It would seem that a court of equity might well hesitate before giving such a harsh construction to the contract.

In times past such courts have been in the habit of ruling that where an instrument is so general in its terms as to release or convey rights not in contemplation at the time the bargain was made and instrument executed, they will restrain the instrument to the purposes of the bargain and confine it to the rights intended to be released or granted.    1 Story, Eq. Jur., sec. 145; *Ramsden v. Hylton*, 2 Ves. Sr. 304; *Powell v. Cobb*, 3 Jones, Eq. 456; *Pomeroy v. Benton*, 57 Mo. 551.

It is quite evident that Pulitzer never made such a contract as has been attributed to him.    Indeed, it may be said that no sane man would do so.    It is beyond rational human belief.    But conceding that he did such an exceedingly improbable thing, a court of *conscience* will not lend its aid in enforcing such a hard and unconscionable contract, but will leave the party who seeks specific performance of it to his remedy at law.

Instances are quite frequent where the specific enforcement of a contract has been denied if such enforcement would be attended by circumstances of hardship or oppression, or would be unconscientious or unreasonable, or if a hard bargain, or where a decree for specific performance would be inequitable under all the circumstances.    *Kimberley v. Jennings*, 6 Sim. 340;

*Cathcart v. Robinson*, 5 Pet. 276; *Cannaday v. Shepard*, 2 Jones, Eq. 224; 2 Story, Eq. Jur. [13 Ed.], sec. 769; *Hamilton v. Grant*, 3 Dow, 33, and numerous other cases cited in note to section 397; Fry, Spec. Perf. [3 Ed.]

And it is always open to a defendant in such cases to contend that a wrong would be inflicted on him by going beyond the ordinary remedy (viz., an action at law for damages) greater than would be inflicted on the plaintiff by refusing to interpose. Adams' Eq. [8 Ed.], by Ralston, 83, and cases cited.

This is only analogous to the equitable rule which allows a defendant in a suit for specific performance to resist a decree on slighter evidence than a plaintiff would have to make out his case upon. *Hill v. Coal Mining Co.*, 119 Mo. *loc. cit.* 28, *et seq.;* 2 Story, Eq. Jur. [13 Ed.], secs. 769, 770.

And if specific execution of a contract would cause a defendant to incur the risk of a forfeiture or of being sued, such execution will be denied. Fry, Specif. Perf., sec. 409; *Peacock v. Penson,* 11 Beav. 355; *Harnett v. Yeilding*, 2 Sch. & Lef. 549.

Specific enforcement has also been refused where it would result injuriously and with unfairness to third persons not parties to the suit nor to the contract. Fry, Specif. Perf., sec. 385; *Thomas v. Dering*, 1 Keen, 729. This is precisely the attitude of Mrs. Pulitzer, Davis, White and Carvalho.

Here there can be no question, it would seem, that the contract before us, construed as it was by the court below, should be regarded as hard and unconscionable, both as to Pulitzer and as to the corporation, and therefore on this ground alone, specific performance should be denied.

*e.*    The contract as relied on by Jones in this case was one of personal service, and being such, can not be

specifically executed.    If it could be done, it would amount to compulsory service and would consequently fall under the ban of constitutional provisions. *Clark's* case, 1 Blackford, 122; *Thompson's* case, 117 Mo. 87; 2 Beach, Mod. Contr., sec. 1593, and cases cited.

It makes no matter that coupled with the contract for personal service was one for the purchase of property, as under the authorities, to be presently cited, this feature of purchase is wholly immaterial.   And inasmuch as the contract of purchase in the case at bar was fully performed, so far as money was concerned, nothing was left of the contract but the stipulation employing Jones as editor and manager for a period of five years.   That Jones should edit and manage the paper for that period was a part consideration to Pulitzer for the sale of the stock by him to Jones.

*  In former times, contracts involving the relation of employer and employee and the continuation of such relation, have been enforced. *Ball v. Coggs*, 1 Brown's Cases in Parl. 140; *East India Co. v. Vincent*, 2 Atk. 83, decided respectively in 1710 and 1740.   But these cases have long since ceased to be authority. These two cases, however, are the only ones to be found where an *employer* has, on the application of an employee, been compelled to continue the relation existing between them.

The general rule undoubtedly is that one person is not compellable to serve another though his contract is that way, and on the other hand though one person has thus contracted, yet he is not compellable to continue another in his employ.   The remedy in such cases is by an action at law for damages for breach of the contract. *Sanquirico v. Benedetti*, 1 Barb. 315; *Burton v. Marshall*, 4 Gill, 487; 2 Kent. Comm. 258, note b.

There are exceptions to this general rule, but they relate to the enforcement of negative covenants, in cer-

tain particulars and exceptional cases which only go to prove the rule.   See *Rogers Mfg. Co. v. Rogers*, 20 Atl. 467, and cases cited.

That rule is illustrated by many cases.. Thus in *Mair v. Tea Co.*, L. R. 1 Eq. Cases, 410, on condition that he should be appointed its agent in India, the plaintiff subscribed to shares in the company.   Accordingly he subscribed for the shares, received his appointment and acted under it for some time.   Then the company proposed to dispense with his services.   Thereupon he sent in his resignation, but demanded that he be allowed to surrender and be relieved from his stock subscription.   Meeting with refusal in this, he sought to enjoin the company from dismissing him.   The court said:   "I can not see my way to granting the plaintiff the relief asked, the whole matter being one for a court of law to deal with, so long as care is taken that the plaintiff shall not be prejudiced in the proceedings at law by his voluntary resignation.   The contract between the plaintiff and the company must be regulated by the articles of association only, on the faith of which other persons have incurred their liability, and the court can not enter into any arrangements antecedent to the articles.   Even assuming, in favor of the plaintiff, the construction given by him to the articles that he was to be irremovable, except by the authority of a general meeting, or that his acceptance of shares was conditional on his being retained as agent, the court can not act in his favor, as the duties of an agent are in the nature of personal services, and, as such, incapable of being enforced in equity."

It will be here observed that in the case just cited the acquisition of the shares was a part of the consideration which induced the plaintiff to acquire the property interest, thus forming a striking parallel to the case at bar, where the service of Jones as editor

and manager is part of the consideration moving from him to Pulitzer, made so by the express terms of the contract.

In *Ogden v. Fossick*, 32 L. J. Rep. Eq. N. S. 73, a bill was filed for the purpose of enforcing the specific performance of an agreement between the plaintiff and defendant, whereby the defendant agreed to grant to plaintiff a lease of a wharf and premises for twenty-one years, and the plaintiff agreed to employ the defendant as manager at the wharf at a salary and commission, the agreement providing that the employment should be co-extensive with the tenancy.  The vice-chancellor decreed specific performance as to the *lease*, and denied it as to the residue.  But this decree was reversed on the grounds that the provisions of a contract to lease and for personal sevices, were *"welded together,"* that a court of equity could not grant *a partial specific performance*, and that the court could not "compel the plaintiff to carry on the business or to employ the defendant," that, therefore, as it could not do this, could not do complete justice, it would not "interfere *partially."*

So in *Stocker v. Brockelbank*, 20 L. J. N. S. Eq. Cases, 408, the plaintiff was appointed manager of a match factory and was to receive by way of salary a gross sum at the end of his term and on every quarter day a percentage of the net proceeds of the business. There was also a provision dependent upon certain contingencies, for the purchase of the business by the plaintiff.

Plaintiff was discharged—for neglect of business as defendants alleged—without cause as he alleged— and he prayed an injunction against defendants to enjoin them from excluding him from the management.

The Lord Chancellor held that this was simply a contract of hiring and service, the remuneration to be

measured with reference to the profits of the business.

"If that be so, is there any instance (I am not aware of any—none has been cited; though my attention has been called at other times to questions of this nature, I do not recollect any) where it has been supposed that a contract of hiring and service could be made the subject of an application to this court, if the the employer claimed the right to discharge his agent, or to dismiss his servant or manager, or by whatever name the party to perform the service is to be denominated? I do not recollect any instance of any attempt on the part of a court of equity to compel the employer to retain the servant, agent, or manager, and not to forbear to leave him to his remedy at law for the breach of it. I know of no such case, and I should be surprised if that principle could be recognized by the court; for consider what the effect would be; how is it possible for an employer or an agent to go on in the intimate connection which such a contract is calculated to create? They are to be on the same premises, acting in the management of the same business in this case; and if there is mutual dissatisfaction, well or ill founded, it is perfectly clear that a management conducted under such circumstances, must tend very much to the prejudice of the concern."

In the case just cited, as in the two preceding ones, the plaintiff did not occupy the position of a mere employee; he not only was a manager, but more than that had a personal interest in the business, was in receipt of a portion of the profits, but had also a right based on certain contingencies to purchase a proprietary interest in the business. But notwithstanding this, an injunction was denied.

*Bainbridge v. Smith,* 41 Chan. Div. 462, was a suit for specific performance of a contract and for an injunction against its breach.

Plaintiff's father sold a brewery to an incorporated company and it was agreed that the father should act as managing director for ten years, and if he died or retired, his son (plaintiff) should act as managing director for the unexpired term of ten years. Managing directors were to receive a salary of 3,000 pounds per year. Plaintiff's father was to furnish him with shares sufficient to qualify him as a managing director. There was a controversy as to whether this had been done. The question was submitted to a general meeting of the company, whether, if plaintiff had the requisite number of shares, they desired him as director, the court saying:

"If the company says that even if plaintiff has the qualifications they do not desire him to act as one of the managing directors, we should not grant any injunction, because it would be contrary to the principles on which the court acts to grant specific performance of this contract by compelling this company to take this gentleman as managing director, although he was qualified so to act, when they do not desire him to act as such."

This case also is substantially identical with the one at bar, so far as legal principles are concerned. And it certainly could not be material that in the one case the property consisted of a brewery and in the other a newspaper, or in the fact that in the one case the shares were bought by the plaintiff's father, and in the other by plaintiff himself, since in either case the contract was not simply for employment, but coupled therewith were stipulations for the purchase of stock in the company and for the management of its business.

In *Davis v. Foreman*, 3 Ch. L. R. 1894, p. 654, Foreman had employed Davis as manager to take care of, conduct and manage the business of a carrier, then being carried on by Foreman. Davis was to serve

faithfully, etc., and was to get all the profits of the business above a certain fixed sum, which Foreman was to have. So long as Foreman drew the stipulated sum for himself, he agreed not to discharge the manager except for misconduct or breach of agreement.

Foreman undertook to terminate the employment and Davis sought to enjoin him, but the injunction was refused.

In *Pickering v. Bishop of Ely*, 2 Y. & C. Ch. 249, the plaintiff held a confidential position in the see, and his compensation was not a fixed salary but consisted of certain fees and emoluments. He brought his suit to enjoin the bishop from dismissing him. The court said:

"The leases which Mr. Pickering claims a right to prepare, as well as engross, being all the leases that may be granted by way or renewal, 'or otherwise,' by the Bishops of Ely of lands and hereditaments belonging to the see; there being claimed too, such a right of access to the miniment room in the bishop's residence as this bull alleges; and the closest knowledge of all his temporal concerns connected with his see being the necessary consequence of what the plaintiff asserts, it is obvious that it is of the highest importance to the safety of the temporal interests of the bishop for the time being, and his ordinary comfort, that the person invested with such powers should be a man not merely respected by him, not merely worthy of trust, but also personally acceptable to him. To force upon him in such characters a person however estimable, however professionally eminent, who is objectionable to him, or in whom he does not happen to confide, would, if legal, be surely hard; and sitting in a court of equity, I do not feel any inclination to do it."

The injunction was also refused for absence of mutuality, because "the bishop could not, as plaintiff,

compel Mr. Pickering to perform specifically those duties and services which he is seeking to compel the bishop to permit him specifically to perform."

Numerous other English cases *apropos* the case in litigation have been brought to our attention by the industry of counsel for defendants. They all speak the same language; they all deny that an employer can be enjoined from discontinuing his relation with his employee, or from dismissing him from his services.

The American cases are of the same import. Thus in Michigan it is said:

"Courts of equity can not assume to specifically enforce an agreement to enter a copartnership, and as a member of the firm to use and exercise personal skill and judgment   *   *   *   from time to time, in the control and management for the firm of the partnership business; and they will not, therefore, enforce the other side of an agreement of which such an agreement is the counterpart.   *   *   *

"Equity will not enforce specific performance of a contract   *   *   *   where the duties to be performed on the other side are such as to be incapable of being specifically enforced.   *   *   *   As the court possesses no means by which to work out performance on the part of the complainant, he would become at once invested with the benefit for which he prosecutes, whilst the defendant would be left standing upon a naked right to exact the consideration through the future performance of duties incapable of being specifically decreed. The doctrine of the court will not sanction such one-sided relief." *Buck v. Smith*, 29 Mich. 166.

In Iowa the defendant had contracted to give the plaintiff not only the handling of through grain, but the right to do all the work of a certain description

which the defendant had need of. The plaintiff tried to enjoin a breach of the contract, but the court said:

"The nature of the contract and the character of the mutual covenants present an insuperable objection to a remedy of specific performance. Plaintiffs' covenants, as we have seen, impose upon them an obligation to maintain for a long period of years, buildings and machinery of considerable value; during this time they are bound to render services—to do work for defendants requiring the outlay of money, the exercise of skill, care and watchfulness, and demanding on the part of those employed integrity and faithfulness. These covenants are personal in their nature; they require the exercise of personal qualifications and qualities.

"Equity will not require defendants to perform their covenants unless plaintiffs, by a like proceeding, may be compelled to perform theirs; nor will it interfere, if it appear defendants are not secure in their rights and remedies for violation thereof by plaintiff." *Richmond v. Railroad*, 33 Iowa, 423.

The last case we shall cite, although there are many others, is that of *Coburn v. Cedar Valley Land & Cattle Co.*, 25 Fed. Rep. 791.

The Cedar Valley Land & Cattle Company was an English corporation doing business in the Panhandle of Texas. It made a contract with Coburn and Ewing, by which Coburn and Ewing bought $100,000 of the shares of the company, and apparently by subscription, although that does not clearly appear. It was expressly agreed, and agreed in writing, that the company should employ Mr. Ewing for a period of three years as general manager at a salary of $600 per year. Before the term expired the company notified him that it would dispense with his services. He brought this suit to enjoin the company from interfering with his

management of the cattle company. He had, as the plaintiff alleges in this case, a contract with power to manage and control, and he alleged, as the plaintiff does in this case, that he was the man above all others to manage the company because he understood the business as no one else did, and particularly as the man to whom he was directed to turn over the property did not.

The court heard the case on motion to dissolve. The motion stated among other reasons that the court had no jurisdiction to specifically enforce a contract of that sort, and this ground of the motion was granted.

In all the above cases, and others contained in the brief of counsel with the exception of the two obsolete cases heretofore cited, the courts with unbroken uniformity have refused unconditionally to enforce a continuance of the relation of employment. And the fact that the same contract contained a stipulation for an interest in the business, did not at all affect the result, nor induce equitable interposition.

So far as concerns injunctive relief when invoked for accomplishing indirectly specific performance, all of the authorities agree that an employer can not, in circumstances like the present, be coerced into continuance of his employee in his service, merely because such employee has a "property right" in the control and management of the business in which he is engaged.

*f.* And the powers of a court of equity are not one whit enlarged in this regard by reason of our statute. R. S. 1889, sec. 5510. That statute is simply declaratory of the ordinary equitable rule respecting injunctions. Adams, Eq. [8 Ed.], Ralston, 207; 1 High on Injunctions, sec. 23; *Neiser v. Thomas*, 99 Mo. 224; *Root v. Railroad*, 105 U. S. 189.

But it is entirely immaterial to our present purpose whether the power of a court of equity is enlarged in

regard to the issuance of injunctions or not, for the reason that when an injunction is sought in aid of specific performance, the case turns upon whether the complainant makes out a case for specific performance. If he does not, in no event will the injunction go. 2 Beach, Mod. Laws Contr., sec. 958.

*g.* In this case while the general concession is fully made that a court of equity can not enforcé a contract for personal services, yet it is also said: *"But this want of power in the courts is supplied in the contract itself."* This remark prompts this question: If the courts can not enforce a contract for personal services, *how can the contract enforce itself?* And if it can not enforce itself and can not be enforced by the courts, what account is it?

*h.* The present contract can not be specifically enforced, because if it admits of the construction for which Jones contends, and which the lower court upheld, it is *ultra vires* and against public policy. That courts of equity will not enforce the specific execution of a contract when opposed to public policy is matter of familiar knowledge. 2 Story, Eq. Jur., sec. 769 and cases cited.

As heretofore stated, section 2772, Revised Statutes 1889, provides that the property or business of a corporation "shall be controlled and managed" by a board of directors, etc. There is further statutory provision that the directors shall appoint one of their number president, may also appoint a secretary, treasurer and such other officers and agents as the by-laws may prescribe. R. S., sec. 2491. Upon these fundamental conditions depends the very existence of every business corporation in this State, and of these fundamental conditions no corporation can divest itself, and should it contract to do so, such contract is necessarily *ultra vires.*

With the readily granted assistance of the lower court, and with its sanction of the construction put upon the contract by Jones, he to all intents and purposes has become *the corporation*, and is clothed with all its powers and attributes. Practically the corporate organization, the legal entity, has perished.

Manifestly if the construction put upon the contract by Jones, and confirmed by the lower court, and if that contract is to be construed as made by the corporation, and on no other theory can the decree of the court below be upheld, then such contract is made in despite of the statute and in the very teeth of its solemnly enacted provisions.

A case very closely resemblant of the one before us is that of *Flagstaff Mining Co. v. Patrick,* 2 Utah, 304.

Briefly told, the facts in that case are these: The directors of a mining company agreed with one Davis, a creditor of the company, that one Patrick should be appointed manager of the company's properties and business, and that he should remain manager until out of the profits of the mine Patrick should pay Davis all advances which the latter had made to the company, and until Patrick should have smelted and delivered certain ores to Davis. The contract further provided that Patrick might be removed and a successor appointed at the pleasure of Davis, but that he could not be removed by the company. Under this contract, Patrick went into possession of the company's property, and was allowed to manage and control the business of the corporation for about three years, when the corporate officers undertook to remove and did remove him from his position and appointed another in his place. The new manager having succeeded in getting possession of the property during the absence of Patrick, steps were taken by Davis, the creditor, and Patrick,

the original manager, to regain possession, whereupon the corporation instituted proceedings to restrain them from entering into or upon the company's premises. An injunction having been granted in the district court, the defendants appealed.

The Supreme Court, after citing Marshall's words that a corporation is the mere creature of the law and possesses only those powers which the charter of its creation confers upon it either expressly or as incidental to its very existence, thus proceed:

"It is further urged that the contract with Davis was *ultra vires* in another respect, that it placed beyond the reach of the corporation, for an indefinite time, the appointment and removal of its agents. The contract required that Patrick should be the agent, and that he could be removed by Davis but not by the company, until Davis had been repaid advanced money and certain ores had been delivered to him, and that Davis could remove Patrick at his pleasure, and appoint another agent for the company in Patrick's stead. The articles of association say that the directors shall have power to appoint and remove agents, but the directors say that Davis may do these things and the directors shall not do so. The power to appoint agents and to remove unfaithful ones, is a trust reposed alone in the directors, and they can not contract that power away. If that power is to be surrendered by the directors, it can only be surrendered by the corporation, and not to a stranger. If the directors could transfer this power to a stranger, then we might have the anomalous case of the formation of the corporation for mining purposes and the power assumed by the directors and without the consent of the corporation, to put the property of the corporation beyond the reach of the corporation, and to make the carrying out of the object of the corporation an impossibility. The power to appoint and remove

agents and managers rests with the company, and this power can not be shifted or taken away by any contract made by the directors. *Neall v. Hill*, 16 Cal. 145; Grant on Corp. 243."

Not only is the contract under discussion *ultra vires* the corporation, but is also void as opposed to public policy, for the reason that with a sale of stock in the corporation it welds an agreement to give the purchaser a position for five years at a large salary, and in addition thereto the positions of director, president, and manager, and besides the absolute management and control of the company's business for a like period.

Of course the holder of stock in a corporation may sell it, but he will not be permitted in conjunction with such sale to sell either an office of trust in the corporation, or a position with a salary or the control of the corporate business. This subject is illustrated by many authorities; there are none to the contrary.

Some of the leading ones on this subject are the following:

*West v. Camden*, 135 U. S. 507. In this case there was an agreement to elect the plaintiff permanent vice-president of the Baltimore United Oil Company with a salary of at least $5,000 per annum. The consideration was that the firm of West & Company should transfer their oil refining business to the Baltimore United Oil Company at a fixed price and take stock in said Baltimore Company. Camden held and controlled nearly all the remaining stock of the company, about nine tenths. After retaining West for a few years he was discharged without cause, and he thereupon sued Camden on the contract—held that the contract was void and against public policy.

*Guernsey v. Cook*, 120 Mass. 501. In this case there was a contract by Mr. Cook, who was a stock-

holder in and president of the India Company, of Salem, Massachusetts, with Mr. Guernsey, under the terms of which Guernsey purchased one hundred shares of stock from Cook, and Cook promised to secure Guernsey the office of treasurer of the corporation, at a salary of $3,500 per annum—held the contract to be against public policy.

*Noel v. Drake,* 28 Kan. 265. In this case Noel had entered into a contract with Drake, a director and the president of a national bank, to buy of the latter one hundred and fourteen shares of stock in the bank at $140 per share, upon the condition that he, Noel, should be made cashier of the bank. Afterward Drake notified Noel that he could not and would not comply with the contract. Thereupon Noel brought his action to recover damages for the breach thereof—held that the consideration of the contract being against public policy the contract was void and Noel was not entitled to recover any damages.

*Wilbur v. Stoepel,* 82 Mich. 344. This suit was brought upon the following written agreement:

"In consideration of the undertakings of De Witt E. Wilbur in connection with the Stoepel Lumber Company, and as part of the contract for the sale of $10,000 of the capital stock of said company by us to him, we hereby agree that if at the end of two years he decides to withdraw from said company we will repurchase the stock he buys of us, or as much of it as he may then have, for cash, at 80 per cent of its par value; and if at any time during the first two years the said company dispenses with his services we agree to buy back the stock on the same terms as above stated; but in either case we stipulate to have three months' time in which to take and pay for the same.

"WILLIAM C. STOEPEL,
"JOSEPH E. WATSON.

"April 1, 1884."

At the time this agreement was signed the corporation was composed of William C. Stoepel, Joseph E. Watson, and Herman R. Stoepel. Defendants desired to sell four hundred shares to plaintiff and he was to become manager of the business—held illegal and against public policy.

The most recent case touching such transactions is that of *Fennessy. v. Ross*, 39 N. Y. S. 323. It will be noted on reading that it strongly resembles the case under review.

The plaintiff held a majority of the stock in three corporations. The defendant agreed to buy some of this stock. It was agreed as part of the same transaction that he should be made general manager of the companies at a salary of $1,500 per year. He was also to be elected vice-president and was to have one half representation in the board of directors. The defendant was an expert in the business of the companies, and the plaintiff made the contract in the belief that it was for the best interests of the companies and the other shareholders. The contract was held to be void.

*i.* Moreover, the contract in this case, even had it been formerly ratified by the unanimous vote of all the stockholders, would still possess the taint of being against public policy, and therefore void. Such contracts are incapable of ratification. 2 Beach, Mod. Contr., secs. 1604, 1443, and cases cited.

For the reasons aforesaid, and inasmuch as the plaintiff has no standing in a court of equity, the decree should be reversed and the petition dismissed.

The foregoing opinion was prepared and presented to my associates after the motion for a rehearing was filed, but it has been rejected by them all except Judge ROBINSON, who concurs in all that I have said.